Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiff*

# IN THE FEDERAL DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cora J. Waller,<br><br>    Plaintiff,<br><br>v.<br><br>City of Nogales, et al.,<br><br>    Defendants. | Case No. 4:22-cv-00244<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (COUNT I)** |

Pursuant to Fed.R.Civ.P. 56, Plaintiff hereby moves for partial summary judgment on Count I of Plaintiff's Second Amended Complaint, Doc. 63, as to Defendant Bermudez and Defendant Bunting. In support, Plaintiff states as follows:

**I.   DEFENDANTS BUNTING AND BERMUDEZ SEIZED COCKRUM ALONG GRAND AVENUE WITHIN THE MEANING OF THE FOURTH AMENDMENT.**

   **a. Defendant Bermudez Seized Cockrum by Shooting and Killing him.**

Under the Fourth Amendment, a seizure occurs when there is "a governmental termination of freedom of movement through means intentionally applied." *Brower v. Cnty.*

1

*of Inyo*, 489 U.S. 593, 597 (1989). When an officer intentionally fires upon a vehicle and one of the bullets strikes a vehicle occupant, the officer has seized that individual. *Villanueva v. California*, 986 F.3d 1158, 1167 (9th Cir. 2021) (holding that a passenger "was seized under clearly established law as soon as the Officers intentionally fired at the Silverado to effect the stop" and the passenger received a bullet). As of May 2021, it was clearly established that a seizure occurs even if the driver, having been shot, "is not subdued" and continues driving. *Torres v. Madrid*, 141 S. Ct. 989 (2021). Here, of course, Mr. Cockrum *was* subdued. It is undisputed that Chief Bermudez fired 13 bullets, PSOF 104, and that Chief Bermudez's bullet killed Mr. Cockrum. PSOF PSOF 8. Finally, it is undisputed that Bermudez shot Mr. Cockrum under the color of state law. PSOF 2, 3, & 4.

### b. Defendant Bunting Seized Cockrum by Intentionally Firing upon his Vehicle and Causing Cockrum to Stop his Vehicle.

Traditionally, a "seizure" was achieved in only one way: by "application of physical force" upon the body of the suspect. *California v. Hodari D.,* 499 U.S. 621, 625 (1991). Only later did the Supreme Court recognize that a seizure can also occur where an officer "has in some way restrained the liberty of a citizen" by means of "show of authority." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968).[1] Here, it is unclear whether any of Detective Bunting's 28 shots struck Mr. Cockrum's person. Consequently, if Detective Bunting seized Mr. Cockrum at all, he seized him by means of a show of authority that in some way restrained Mr. Cockrum's liberty. *See, e.g., Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468,

---

[1] This category of seizure is also sometimes referred to in the caselaw as "acquisition of control."

2

476 (6th Cir. 2022) ("Had [the officer's] shots hit the Campbells, then they would have been seized under this category. Since Fox missed and there was no physical contact, we look to the second type" of seizure). Detective Bunting's show of authority was the firing of his weapon. PSOF 83-99; *see, e.g., Bella v. Chamberlain,* 24 F.3d 1251, 1256 (10th Cir.1994) ("The shots constituted an assertion of authority").

Within this 'show of authority' category, a seizure can occur only if the officer's overt action elicited one of two responses from the suspect: "either voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021). Without "actual submission" by the suspect, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007); *see also Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) ("an assertion of authority by the police without submission by the fleeing person does not constitute a seizure"). Lesser forms of authority, while sometimes sufficient to cause a seizure, may nevertheless leave a question as to whether the suspect was seized. A fleeing motorist is not seized who, having been pursued by police at high speeds, loses control and crashes his vehicle. This is because, "though he was in fact stopped, he was stopped by a different means." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989). While an officer's flashing lights most certainly does not *cause* the seizure of a driver who accidentally spins out of control, courts are cautioned against "draw[ing] too fine a line" in the more ambiguous causation scenarios. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598–99 (1989) (cautioning against finding no seizure of a suspect "who has been stopped by the accidental discharge of

a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg.")

Because "a seizure is a single act, and not a continuous fact," the moment of a seizure can be identified as a specific moment in time, even in a fast-moving situation. *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quoting *Thompson v. Whitman,* 18 Wall. 457 (1874)). Thus, in a vehicle chase, the question becomes when an officer's show of authority yields to either a voluntary submission or the termination of the suspect's freedom of movement. "[W]hat may amount to submission depends on what a person was doing before the show of authority[.]" *Brendlin v. California,* 551 U.S. 249, 262 (2007). In this instance, we will never know with certainty whether Detective Bunting's 28 shots caused Mr. Cockrum to voluntarily submit by intentionally removing his foot off the accelerator or whether the gunshots caused an involuntary physical reaction in Mr. Cockrum's body. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[d]eadly force cases pose a particularly difficult problem under this [Section 1983] regime because . . . the person shot dead is unable to testify").

This much *is* known: what Mr. Cockrum "was doing before [Detective Bunting's] show of authority," *Brendlin,* 551 U.S. at 262, was driving his truck (with its trailer dragging behind) at a slow rate of speed, southbound along Grand Avenue. PSOF 70, 87, 79, 103. Detective Bunting was the first law enforcement officer to initiate gunfire along Grand Avenue. PSOF 97. Detective Bunting first aimed and fired at Mr. Cockrum's windshield, quickly determining this to be ineffective at causing the truck to stop. PSOF 92. Detective Bunting next aimed and fired at the driver's side window. PSOF 93. Detective Bunting next

4

aimed and fired at the driver's side door at a location just below the driver's side window. PSOF 94. Upon firing at this final target, Detective Bunting perceived that the truck started to slow down, PSOF 95, and that his shot had been "effective." PSOF 98. Because the truck trailer was dragging along the asphalt in this moment, there is a strong inference that Mr. Cockrum's truck could have slowed down or come to a stop by merely lifting his foot off of the accelerator. Officer Pimienta started firing his weapon along Grand Avenue only *after* Detective Bunting fired his last shot. PSOF 99. Before firing his first shot, Officer Pimienta perceived that Mr. Cockrum's truck was not in gear, and saw that Mr. Cockrum "threw himself back" in his driver's seat. PSOF 100, 101.

The undisputed facts here stand in contrast to other cases where the motorist clearly did not submit to an officer's show of authority. For example, the District of Hawaii found that an officer had not seized a motorist where a suspect stopped his vehicle, the officer "unsuccessfully attempted to open the driver's side door" while the car was stopped, but then "in response, [the suspect] accelerated" again. *United States v. Chan*, 2023 WL 1069702, at *1 (D. Haw. Jan. 27, 2023). The court concluded that "although [the suspect] paused momentarily . . . [the suspect] quickly proceeded to ignore [the officer's] instructions and flee, in clear *non*-submission.") *Id.* (emphasis in original). Similarly, the Tenth Circuit found no submission to authority where a motorist "back[ed] away from a police car with flashing lights." *United States v. Salazar*, 609 F.3d 1059, 1067 (10th Cir. 2010). While it is undisputed that Mr. Cockrum fled clearly-marked law enforcement vehicles for approximately one hour *before* the seizure in question, it is also undisputed that – unlike the

two cases cited above – Mr. Cockrum never *resumed* his flight after the fusillade along Grand Avenue. Indeed, we now know that Mr. Cockrum had been fatally wounded in that moment. PSOF 107, 108.

### II. NO REASONABLE OFFICER WOULD HAVE BELIEVED THAT COCKRUM POSED AN IMMEDIATE THREAT IN THE MOMENTS WHEN DEFENDANTS BERMUDEZ AND BUNTING FIRED UPON HIM.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's reasonableness standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774–75 (2014). Like all Fourth Amendment excessive force claims, this case requires a consideration of the three familiar *Graham* factors: "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," and whether the suspect is resisting or "attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). But one of them is the "most important" – whether the suspect "presented an immediate danger to the Deputies or others." *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 692 (9th Cir. 2023); *see also Tan Lam v. City of Los Banos*, 976 F.3d 986, 998 (9th Cir. 2020) (referring to the 'severity of the crime' and 'actively resisting' prongs as "less important factors"). The Fourth Amendment permitted Defendants Bermudez and Bunting to use deadly force only if they had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (internal citations omitted). Neither officer did.

### a. Neither Bermudez nor Bunting Feared for Their Own Safety While Positioned on Grand Avenue.

Neither Chief Bermudez nor Detective Bunting claimed that they felt they were in harm's way in the moments when they opened fire on Grand Avenue. Nor could they. Since at least 2020 (the year before Mr. Cockrum's death), the Ninth Circuit established that "an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020). Both men aimed at Mr. Cockrum's driver's side door and driver's side window while standing to the east of Mr. Cockrum's southbound truck. PSOF 91. Even where the officer is confined to a tight space and has limited options for quick escape, the Ninth Circuit has found that an officer does not reasonably fear for his life where the errant vehicle is moving away from him. *See, e.g., Adams v. Speers*, 473 F.3d 989, 992 (9th Cir. 2007) (finding an "obvious" constitutional violation where an officer, who was in a "hazardous position" with "little room to open the patrol car door" fired at the windshield of the suspect's vehicle as it moved backward).

Similarly, an officer does not reasonably fear for his life when the fleeing motorist, as here, "did not accelerate toward the police car or the Officers before Officers opened fire." *Villanueva v. California*, 986 F.3d 1158, 1172 (9th Cir. 2021) (holding that "all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could simply step to the side to avoid danger.") (internal citations omitted); *see also Acosta v. City & Cnty. of San Francisco*, 83 F.3d 1143, 1148 (9th Cir. 1996), *abrogated on other grounds by*

*Saucier v. Katz,* 533 U.S. 194 (2001) ("a reasonable officer could not have reasonably believed that shooting at the driver of the slowly moving car was lawful" where the officer could easily have stepped aside). In fact, *every* circuit to have considered an officer shooting from the side has concluded that the officer was not reasonably acting in self-defense. *See, e.g.*, *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003); *Abraham v. Raso*, 183 F.3d 279, 293-94 (3d Cir. 1999); *Cordova v. Aragon*, 569 F.3d 1183, 1195 (10th Cir. 2009); *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019).

Not only did each officer fire his weapon from the side, but he also chased after a fleeing Mr. Cockrum in the moment before shooting. The undisputed facts reveal that each man raced ahead of Mr. Cockrum's lumbering truck with the goal of staging himself for a shootout, PSOF 80, and stood 12-15 feet from Mr. Cockrum's vehicle, PSOF 90.

### b. In the Relevant Moment, No Reasonable Officer Would have Believed that Mr. Cockrum's Truck Posed an Immediate Threat to Civilians.

Shortly after the incident, both Chief Bermudez and Detective Bunting each explained to investigators that they primarily feared for the safety of civilians who may come into contact with Mr. Cockrum and his large truck. Yet no one was able to identify a single pedestrian or civilian vehicle that was in the path of Mr. Cockrum's southbound truck along Grand Avenue. PSOF 84, 86. This is the quintessential speculative danger that cannot serve as the basis for deadly force under the Fourth Amendment.

To the extent that Chief Bermudez and Detective Bunting were relying on past actions by Mr. Cockrum, such reliance would have been objectively unreasonable to justify deadly force. The Fourth Amendment authorizes deadly force to neutralize an imminent *future* threat. Even a serious threat occurring ten seconds before an officer opens fire is sometimes deemed to be objectively unreasonable. *A.D. v. California Highway Patrol*, 712 F.3d 446, 451 (9th Cir. 2013) (finding unreasonable an officer's decision to fire upon a motorist who rammed police cars multiple times just ten seconds earlier). As the Fourth Circuit explained, "even a significant threat of death or serious physical injury to an officer does not justify the use of deadly force unless the threat is <u>immediate</u>." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) (emphasis added). The Ninth Circuit has repeated this lesson many times. *See, e.g., Robinson v. Solano Cnty.,* 278 F.3d 1007, 1014 (9th Cir. 2002) (finding a Fourth Amendment violation where officer pointed (but didn't fire) his service weapon at a man on account of an "earlier use of a weapon").

Similarly, Defendants could not have relied exclusively on an abstract fear that Mr. Cockrum might use his truck as a dangerous weapon on unsuspecting innocents. Even if one were to assume it reasonable for an officer to view Mr. Cockrum's truck as a weapon, the possession of a weapon – alone – is not justification for the use of deadly force. Even in the "Ruby Ridge" civil rights litigation, featuring a family that had intentionally killed a federal agent days before the FBI established a "shoot upon sight" order, the Ninth Circuit reiterated that the Fourth Amendment demands that imminent *future* threats be the basis for deadly force. *Harris v. Roderick*, 126 F.3d 1189, 1204 ("Law enforcement officials may not kill

9

suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *see also George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (firing multiple shots at potentially gun-wielding suspect accused of domestic violence was objectively unreasonable where there was no indication the suspect was pointing the gun or holding it in the threatening manner).

Here, all the evidence available to Detective Bunting and Chief Bermudez suggested that Mr. Cockrum intended no harm with his truck and that he merely wished to escape the grasp of the pursuing officers. Mr. Cockrum drove at or below the speed limit throughout the approximately one-hour before the final shootout, even when making somewhat unusual maneuvers with his truck. PSOF 24-47, 32, 34, 38-41, 48-49. Mr. Cockrum stopped at a stoplight, even as officers were actively pursuing him. PSOF 61. Mr. Cockrum intentionally avoided two marked patrol vehicles earlier in the day that had been strategically placed in the middle of an interstate exit. PSOF 50-56. Mr. Cockrum was driving at a slow speed in the moments before the two officers opened fire. PSOF 79.

### c. The Supreme Court has Never Authorized Police to Shoot a Motorist Under the Circumstances Presented Here.

In recent years, the Supreme Court has decided three cases applying the Fourth Amendment reasonableness test to a police officer's use of force on a fleeing motorist. None involved a slow-moving vehicle in broad daylight that was neither bearing down on officers nor civilians. In *Scott v. Harris*, the Supreme Court was presented with a fleeing vehicle "racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast,"

10

passing "more than a dozen other cars, cross[ing] the double-yellow line, and forc[ing] cars traveling in both directions to their respective shoulders." *Scott v. Harris*, 550 U.S. 372, 379 (2007). Describing the high-speed pursuit as "a Hollywood-stye car chase of the most frightening sort," *Id*. at 380, the Court found it reasonable to employ a "maneuver which causes the fleeing vehicle to spin to a stop," *Id*. at 375.

It wasn't just the speed that led to this conclusion, but also the particular type of force. While Officer Scott's maneuver presented "a high likelihood of serious injury or death," it did not present "the near *certainty* of death posed by, say . . . pulling alongside a fleeing motorist's car and shooting the motorist." *Scott v. Harris*, 550 U.S. 372, 384 (2007) (emphasis in original). Indeed, "*Scott* strongly suggests that the reasonableness balancing must take into account that there is a spectrum of 'deadly force,' and that just because a situation justifies ramming does not mean it will justify shooting a suspect." *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009).

The second Supreme Court presented precisely this "near certainty of death" hypothesized in *Scott*. The officers in *Plumhoff v. Rickard* engaged in a similar Hollywood-style pursuit at "speeds over 100 miles per hour," but the pursuit here terminated with gunfire. *Plumhoff v. Rickard*, 572 U.S. 765, 769 (2014). And the officers in *Plumhoff* experienced perhaps even greater vulnerability than Officer Scott: after the suspect's car spun out and officers began to approach on foot, the suspect pressed down his accelerator, the vehicle started to rock back and forth, and the officer was forced "to step to his right to avoid the vehicle." *Plumhoff v. Rickard*, 572 U.S. 765, 770 (2014).

The most recent Supreme Court case suggested that even reckless high-speed pursuits accompanied by credible threats of gun violence do not necessarily justify lethal force. In *Mullenix v. Luna*, the Court granted qualified immunity to an officer who fatally shot a fleeing motorist traveling "at speeds between 85 and 110 miles per hour" and who twice called the dispatcher "threatening to shoot at police officers." *Mullenix v. Luna*, 577 U.S. 7, 8 (2015). Even with these striking facts, the Court did not find the officer's gunshots to be objectively reasonable. Instead, the Court merely concluded that the Fourth Amendment right was not "beyond debate" in 2010 when the incident occurred. *Id.* at 11. In doing so, the Court left undisturbed the circuit court's earlier determination that the officer acted unreasonably and, in the process, 'established' the right for similarly-positioned motorists in the future. More importantly, the Supreme Court easily distinguished police pursuits taking place "at relatively low speeds." *Id.* at 18 (referring to low-speed cases as "too factually distinct to speak clearly to the specific circumstances here").

Thus, the Supreme Court has never decided a case with facts "particularized to the facts of th[is] case" where "an officer act[ed] under similar circumstances." *White v. Pauly*, 580 U.S. 73, 79 (2017). Here, officers on Grand Avenue were confronted with neither the high speeds of *Scott* and *Mullenix*, nor nor the up-close-and-personal contact with the vehicle as found in *Plumhoff*.

### d. The Crimes that Officers Suspected Mr. Cockrum of Committing were not of a Serious Nature.

The *Graham* factors are assessed on "what the officer knew at the time." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Most importantly, this first of the *Graham* factors asks about the "severity" – ie, the level of violence – of the underlying crime or crimes. As the Ninth Circuit has explained, "a crime's status as a misdemeanor or felony is not the key question but rather provides a rough proxy for the true object of the court's inquiry: whether a given offense indicates a suspect's potential dangerousness." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1165 n.8 (9th Cir. 2011). Even where a crime involves violence, it does not necessarily "warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." *Smith v. City of Hemet*, 394 F.3d 689, 702–03 (9th Cir. 2005) (describing use of excessive force where suspect was accused of domestic violence). And as explained above, the Ninth Circuit has repeatedly found violations of the Fourth Amendment where officers fire upon suspects of particularly serious offenses where there is no indication of imminent *future* risk of danger from the suspect. Simiarly, "a failure to fully or immediately comply with an officer's orders" does not automatically justify "the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

Aside from the fleeing itself, Cockrum was accused merely of flashing a knife earlier in the day, at a distance from the individuals who perceived a threat. PSOF 11-13. He did so as his vehicle window was rolled up. PSOF 12. And at least one of the knives had been

13

discarded while Mr. Cockrum was traveling along the interstate, long before he reached the location where officers opened fire on him. PSOF 42-47. Officers knew this fact before the shooting began. PSOF 46-47. There was no firearms violation. PSOF 109.

### III. DEFENDANT BERMUDEZ'S ACTIONS WERE OBJECTIVELY UNREASONABLE EVEN IF BUNTING'S ACTIONS ARE FOUND TO BE REASONABLE.

When officers act reasonably in initiating lethal force, "[i]t stands to reason that . . . the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). But, as explained elsewhere, the only purported threat remaining along Grand Avenue *had* ended by the time Chief Bermudez started firing upon Mr. Cockrum. After all, "terminating a threat doesn't necessarily mean terminating the suspect," and a reasonable officer may be expected to "reassess the situation rather than continue shooting." *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). For example, an officer violates the Fourth Amendment when he shoots a suspect moments after the threat is eliminated – even where the original threat was severe, such as a suspect stabbing the officer. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1002 (9th Cir. 2020) (finding a second gunshot objectively unreasonable, even where the shooting officer was stabbed just a moment earlier).

The Fourth Circuit succinctly articulated this principle: "Force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)

14

(conducting a "separate analysis" where two officers fired upon a fleeing vehicle "mere seconds" apart from one another). The Supreme Court agrees. *See, e.g., Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard"). The Ninth Circuit has repeatedly found subsequent gunfire to be unreasonable even where it followed arguably reasonable gunfire. *See, e.g., Hopkins v. Andaya*, 958 F.2d 881, 886–87 (9th Cir. 1992) (explaining that earlier shots may have been justified but the second volley violated the Fourth Amendment), *overruled on other grounds as stated in Federman v. County of Kern*, 61 F. App'x 438, 440 (9th Cir. 2003); *see also Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (concluding that a second volley of gunshots "violated long-settled Fourth Amendment law" to the extent that the "immediate threat" dissipated after the first round of gunfire).

Here, any reasonably-articulated threat had already dissipated. First, the large number of pedestrians that officers were originally concerned about in the Walmart Parking Lot were non-existent on Grand Avenue (a four-lane highway). PSOF 84, 86. Not only was there a paucity of pedestrians along Grand Avenue, but there were also no civilian vehicles traveling in the immediate vicinity of Mr. Cockrum in the two southbound lanes. PSOF 85. Chief Bermudez and the other officers who opened fire from the Grand Avenue location understood this. In their post-incident interviews with investigators, neither Chief Bermudez nor the other shooting officers at that location could cite a single civilian for whom they were concerned in the moments they opened fire. PSOF 84-86. Mr. Cockrum's truck was traveling

slowly along Grand Avenue, with the brakes of the trailer fully engaged and forcing the trailer to essentially drag along the pavement. PSOF 70, 79, 87, 103.

Moreover, any theoretical threat to civilians that may have existed along Grand Avenue had been eliminated by Detective Bunting's 28 shots just seconds before Chief Bermudez opened fire. It is undisputed that there was a precise sequence to the gunshots, with Detective Bunting fired all or most of his 28 gunshots before Chief Bermudez started to fire. PSOF 96, 97, 99. Chief Bermudez fired in the same moment or slightly after Officer Pimienta saw that Mr. Cockrum had thrown himself back in his driver's seat. Chief Bermudez started firing *after* Detective Bunting independently perceived that his own gunshots were "effective" at reducing the speed of Mr. Cockrum's truck. PSOF 98. Thus, even if this Court were to determine that Detective Bunting had reasonably perceived a threat in the moment that he fired his 28 shots, Plaintiff is still entitled to judgment with regard to the reasonableness of Chief Bermudez's 13 gunshots.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court grant her summary judgment as to Count I (Fourth Amendment excessive force) as to Defendant Bermudez and Defendant Bunting.

1 | Respectfully submitted this 15th day of August, 2023 by:

2 | <u>/s Paul Gattone</u>
3 | Paul Gattone
  | Arizona Bar # 012482
4 | LAW OFFICE OF PAUL GATTONE
5 | 301 S. Convent
  | Tucson, AZ 85701
6 | Email: <u>GattoneCivilRightsLaw@gmail.com</u>
7 | (520) 623-1922
  | *Attorney for Plaintiff Cora Waller*