KAB

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Cora J. Waller,

               Plaintiff,

v.

City of Nogales, et al.,

               Defendants.

No. CV-22-00244-TUC-RCC

**ORDER**

Plaintiff Cora J. Waller, on her own and as personal representative of the estate of Glen Ray Cockrum, Jr., brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.  (Doc. 63.)  Pending before the Court are: (1) Defendants Hathaway and Bunting's Rule 36 Motion to Determine Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2 and 3 (Doc. 64); (2) Defendants Hathaway and Bunting's Motion for Summary Disposition of their Rule 36 Motion to Determine Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2 and 3 (Doc. 71); (3) Defendants Hathaway and Bunting's Motion for Summary Judgment (Doc. 75); (4) City of Nogales, Roy Bermudez, Nicholas Acevedo, Gerardo Batriz, Guadalupe Villa, Robert Gallego, Jesus Gomez, Mario Lopez, and Jose Pimienta's Motion for Summary Judgment (Doc. 77); and (5) Plaintiff's Motion for Partial Summary Judgment (Doc. 87).

## I.    Plaintiff's Operative Complaint (Doc. 63)

In Count One of the First Amended Complaint (Doc. 63), Plaintiff alleges a Fourth Amendment excessive force claim against Defendants Acevedo, Gallego, Batriz, Gomez,

Villa, Lopez, Pimienta, Bunting, and Bermudez.

In Count Two, Plaintiff alleges a *Monell* claim against the City of Nogales and Roy Bermudez in his official capacity based on allegations there was a written policy and/or unwritten custom permitting firing into moving vehicles and use of excessive force when faced with nonviolent individuals acting erratically, but who otherwise pose no imminent threat to officers, to civilians, or to the general public.

In Count Three, Plaintiff alleges a Fourth Amendment failure to intervene claim against Defendants Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, and Bermudez.

In Count Four, Plaintiff alleges a Fourteenth Amendment denial of familial association claim against Defendants Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, Bunting, Bermudez, and Hathaway.

In Count Five, Plaintiff alleges state law claims of battery and wrongful death against Defendants City of Nogales, Hathaway, Bermudez, Bunting, Acevedo, Villa, Gallego, Mario Lopez, Batriz, Pimienta, and Gomez.[1]

In Count Six, Plaintiff alleges a claim under the Americans with Disabilities Act (ADA) against the City of Nogales.

## II.   Dismissal of Claims

Plaintiff did not respond to several of Defendants' arguments that summary judgment should be granted in their favor.  Additionally, Plaintiff requested the denial of summary judgment only as to certain claims. (*See* Doc. 98 at 13–14 ("For the reasons stated above, Plaintiff respectfully requests that this Court deny Defendant Bunting's motion for summary judgment to the extent that it seeks judgment as to Counts I and V, and deny Defendant Hathaway's motion for summary judgment to the extent that it seeks judgment as to the vicarious liability aspect of Count V."); Doc. 93 at 17 ("Plaintiff respectfully

---

[1] Plaintiff's claims in Count Five against Defendants Yanez, Gomez, Luchuga, Villela, Jose Bermudez, David Lopez, and Mesta were previously dismissed by the Court. (Doc. 61 at 11.)

requests that this Court deny the Nogales Defendants' motion for summary judgment to the extent that it seeks judgment as to: Count I against Defendants Bermudez, Batriz, Pimienta, and Gallego; Count III against all Defendants; Count IV against Defendant Bermudez; and Count V against all Defendants.").

As such, Plaintiff concedes to the dismissal of the following claims: (1) the Count One excessive force claims asserted against Acevedo, Gomez, Lopez, and Villa; (2) Count Two in its entirety, (3) Count Four as asserted against Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, Bunting, and Hathaway; and (4) Count Six in its entirety. Accordingly, those claims will be dismissed.

The remaining claims after this dismissal are: (1) Fourth Amendment excessive force claims against Defendants Gallego, Batriz, Pimienta, Bunting, and Bermudez in Count One; (2) Fourth Amendment failure to intervene claims against Defendants Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, Bunting, and Bermudez in Count Three; (3) a Fourteenth Amendment denial of familial association claim against Defendant Bermudez in Count Four; and (4) state law claims of battery and wrongful death against Defendants City of Nogales, Hathaway (solely based on vicarious liability), Bermudez, Bunting, Acevedo, Villa, Gallego, Lopez, Batriz, Pimienta, and Gomez in Count Five.

## III. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts

1   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

2   contention is material, i.e., a fact that might affect the outcome of the suit under the

3   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

4   jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

5   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

6   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

7   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however,

8   it must "come forward with specific facts showing that there is a genuine issue for trial."

9   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

10  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11      At summary judgment, the judge's function is not to weigh the evidence and

12  determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

13  477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

14  all inferences in the nonmovant's favor.  *Id.* at 255. The court need consider only the cited

15  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

16  **IV.   Facts**

17      On May 24, 2021, Santa Cruz County Sheriff's Deputies responded to a report of an

18  unknown individual threatening employees at H&M Distributors in Rio Rico, just outside

19  Nogales, Arizona.  (Doc. 76 ¶ 1.)[2]  An employee stated that the individual—later identified

20  as Glen Ray Cockrum, Jr. (Cockrum)—obstructed the loading docks of the warehouse by

21  improperly parking his 18-wheel semi-trailer truck (hereinafter the semitruck).  (*Id.* ¶ 2.)

22  When employees asked Cockrum to move his vehicle, Cockrum responded by brandishing

23  a knife and brass knuckles.  (*Id.* ¶ 3.)  Fearing for their safety, an employee texted a family

---

[2]  The Court could not locate Plaintiff's controverting statement of facts to Defendants Santa Cruz County and Bunting's statement of facts.  Accordingly, the Court assumes Defendant Santa Cruz County and Bunting's supported facts are true unless clearly contradicted by other parts of the Record. *See* Fed. R. Civ. P. 56(e)(2). The Court did review and consider Plaintiff's "Separate Statement of Facts" filed along with her Motion for Partial Summary Judgment. (Doc. 88.)

member employed in the Santa Cruz County Sheriff's Office's dispatch center, who sent over a deputy to respond to the situation.  (*Id.* ¶ 4.)

By the time non-party Deputy Adrian Soto arrived, Cockrum had moved his vehicle to Malena Produce, the warehouse next door. (*Id.* ¶ 5.)  Soto proceeded to Malena Produce to speak with Cockrum.  (*Id.* ¶ 6.)  Soto wore his standard issue sheriff's deputy uniform, consisting of a tan shirt, green pants, a badge identifying him as a Santa Cruz County Sheriff's Deputy, as well as a large shoulder patch that says "Santa Cruz County Sheriff" in large capital letters. (*Id.* ¶ 7.)  Soto approached Cockrum's vehicle, identified himself as a Sheriff's Deputy, and requested that Cockrum roll down the window. (*Id.* ¶ 9.)  Although Cockrum initially rolled down the window, Cockrum rolled it back up after Deputy Soto asked to speak with him.  (*Id.* ¶ 10. )  When Deputy Soto knocked harder on the door to reestablish contact, Cockrum raised his hands and Deputy Soto observed a knife with a brass knuckle handle in his right hand, and a dagger-like blade in his right hand.  (*Id.* ¶ 11.)  With his right hand, Cockrum made a gesture of licking the blade, followed by a gesture of slitting his throat.  (*Id.* ¶ 12.)  Soto moved 15 to 20 feet away, drew his side arm, and pointed it at Cockrum.  (*Id.* ¶ 13.)  He saw that Cockrum still held the blades and was shaking them, giving him the impression that Cockrum was trying to "hype himself" and attack.  (*Id.* ¶ 14.)  Cockrum quickly turned to the vehicle door as if he was going to open it.  (*Id.* ¶ 15.)  Because he feared physical injury, Soto retreated from Cockrum's vehicle towards his own conspicuously marked law enforcement vehicle.  (*Id.* ¶ 16.)  Soto yelled at Cockrum to drop the weapons and come out with his hands up, but Cockrum did not comply.  (*Id.* ¶ 17.)

After retreating to his vehicle, Deputy Soto requested assistance over the radio, stating Cockrum barricaded himself in his vehicle and pulled a knife on him.  (*Id.* ¶ 18.)  Non-party Deputy Jose Muzquiz and two United States Border Patrol agents responded to Soto's call for help.  (*Id.* ¶ 19.)  Soto utilized the Border Patrol's on-vehicle public announcement system to broadcast a command to Cockrum to exit his vehicle with his hands up.  (*Id.* ¶ 20.)  Although Soto broadcast the message multiple times, Cockrum did

1    not comply.  (*Id.* ¶ 21.)  Instead, Cockrum drove out of the Malena Produce parking lot

2    onto the Interstate 19 Frontage Road heading southbound.  (*Id.* ¶ 22.)

3         At the same time, Sheriff's Corporal Alfonso Flores traveled northbound on the

4    Frontage Road to respond to Deputy Soto's request for assistance.  (*Id.* ¶ 23.)  Suddenly,

5    Cockrum veered across the double-yellow centerline of the Frontage Road towards Flores's

6    vehicle.  (*Id.* ¶ 24.)  Soto interpreted this action as Cockrum's attempt to either run Flores

7    off the road or strike his vehicle.  (*Id.* ¶ 25.)

8         At approximately 1:00 p.m. on the same day, May 24, 2021, Defendants City of

9    Nogales Police Corporal Gerardo Batriz and Officer Jose Pimienta were traveling north on

10   I-19 in Officer Pimienta's fully marked 2021 Ford Explorer patrol vehicle.  (Doc. 79 ¶ 1;

11   Doc. 94 ¶ 1.)  Corporal Batriz and Officer Pimienta were traveling to Tucson to participate

12   in an "honor walk" to accompany the body of Nogales Police Department (NPD) Officer

13   Brinton, who had died as a result of injuries sustained in an on-duty traffic accident on May

14   20, 2021.  (Doc. 79 ¶ 2; Doc. 94 ¶ 2.)  While traveling north on I-19 approaching the Border

15   Patrol checkpoint, Corporal Batriz and Officer Pimienta observed other law enforcement

16   vehicles traveling north at high rates of speed with their emergency lights engaged.  (Doc.

17   79 ¶ 3; Doc. 94 ¶ 3.)   As they arrived at the checkpoint, they observed marked and

18   unmarked Santa Cruz County Sheriff's Department and Border Patrol vehicles at the

19   checkpoint, with some blocking access to northbound I-19.  (Doc. 79 ¶ 4; Doc. 94 ¶ 4.)

20        Defendant Detective Bunting, who was at his desk at the Santa Cruz Sheriff's Office,

21   learned of a subject (Cockrum) who barricaded himself at Malena Produce, and Bunting

22   and non-party Detective Jorge Ainza drove separate vehicles to respond to the scene.  (*Id.*

23   ¶¶ 35-36.)  Bunting and Ainza learned over the radio that Cockrum left Malena Produce

24   and was progressing up Interstate 19 northbound.  (*Id.* ¶ 37.)  When Detective Bunting

25   spotted Cockrum's vehicle, he observed Cockrum cross into the median turnaround just

26   before the Border Patrol checkpoint, and observed a female Border Patrol agent between

27   the truck and trailer portions of Cockrum's vehicle.  (*Id.* ¶¶ 38-39.)  Detective Bunting lost

28   sight of the agent after Cockrum's vehicle drove by and he then heard non-party Ainza fire

shots at the vehicle's tires.  (*Id.* ¶ 40.)  At the time, Detective Bunting believed Cockrum may have struck the Border Patrol agent with his truck.  (*Id.* ¶ 41.)  While near the Border Patrol checkpoint, non-party Detective Ainza fired six shots into Cockrum's vehicle's tires to disable it.  (*Id.* ¶ 43.)  The attempt was unsuccessful, and Cockrum barreled onward on Interstate 19 towards Nogales.  (*Id.* ¶ 44.)

Corporal Batriz and Officer Pimienta observed a white semi driven by Cockrum making a U-turn in the median to head south on I-19.  (Doc. 79 ¶ 5; Doc. 94 ¶ 5.)  In their experience, this was an unusual and unexpected maneuver, and normally the only time a driver makes a U-turn at a border patrol checkpoint is when there are people with warrants in the vehicle or the vehicle is loaded with contraband or undocumented immigrants.  (Doc. 79 ¶ 6; Doc. 94 ¶ 6.)  As Cockrum made the U-turn, Batriz and Pimienta observed the semi-trailer narrowly miss Deputy Ainza, who had to take rapid evasive action to get out of the way of the semi to avoid being hit.  (Doc. 79 ¶ 7; Doc. 94 ¶ 7.)  They observed Deputy Ainza shoot at the semi's tires with his sidearm.  (Doc. 79 ¶ 8; Doc. 94 ¶ 8.)

Corporal Batriz rolled down the passenger window and asked a Border Patrol agent what was happening, and the Border Patrol agent responded, "White semi, male subject, armed and dangerous."  (Doc. 79 ¶ 9; Doc. 94 ¶ 9.)  Corporal Batriz and Officer Pimienta decided to assist with the pursuit of Cockrum, who was now heading southbound on I-19 towards Nogales rather than continue to Tucson for the honor walk for Officer Binton.  (Doc. 79 ¶ 10; Doc. 94 ¶ 10.)  It appeared to Corporal Batriz that Cockrum had no regard for the life and safety of the involved law enforcement officers.  (Doc. 79 ¶ 11; Doc. 94 ¶ 11.)

Detective Bunting pulled in behind Cockrum with his lights and sirens activated, but Cockrum did not stop.  (Doc. 76 ¶ 45.)  As they pursued Cockrum with the vehicles from other law enforcement agencies, Officer Pimienta and Corporal Batriz took the lead position behind the semi with their siren and emergency lights engaged, and used their PA system to instruct the driver to pull over, but Cockrum did not comply.  (Doc. 79 ¶ 12; Doc. 94 ¶ 12.)  Officer Pimienta also radioed the NPD dispatch with the license plate of the

trailer and informed them they were assisting other agencies in pursuit of a semi headed south on I-19 toward Nogales, and that the driver was armed, though Officer Pimienta did not know the weapon with which Cockrum was armed.  (Doc. 79 ¶ 13; Doc. 94 ¶ 13.) Defendant Acting Lieutenant Acevedo relayed on the radio that the driver of the semi had committed assault against a Santa Cruz County Sheriff's deputy, a felony.  (Doc. 79 ¶ 14; Doc. 94 ¶ 14.)  Near Exit 25, Cockrum threw items out the window of the semi.  (Doc. 79 ¶ 15; Doc. 94 ¶ 15.)  As Cockrum approached a construction zone near kilometer marker 15 or 14, the law enforcement vehicles slowed down and backed off from the semi, which continued going sixty-five miles an hour through the construction zone, which had a speed limit of 45 or 55 miles an hour.  (Doc. 79 ¶ 16; Doc. 94 ¶ 16.)  Officer Pimienta was concerned that a civilian vehicle in the construction zone might get hit by the semi, but this did not occur.  (Doc. 79 ¶ 17; Doc. 94 ¶ 17.)

While Corporal Batriz and Officer Pimienta continued following Cockrum towards Nogales, Acevedo was communicating with other NPD officers about setting up roadblocks on the I-19 exits into Nogales to keep Cockrum from entering city limits.  (Doc. 79 ¶ 18; Doc. 94 ¶ 18.)  Defendants Officers Villa and Gomez, and Sergeant Gallego went to Exit 4, while two other officers went to Exit 8.  (Doc. 79 ¶ 15; Doc. 94 ¶ 15.)  Cockrum was able to get around the two vehicles blocking Exit 8 in Nogales and entered the City, proceeding south on Grand Avenue.  (Doc. 79 ¶ 20; Doc. 94 ¶ 20.)  Detective Bunting discontinued pursuit once Cockrum entered Nogales because Sheriff's Office Commander Castillo directed the deputies to serve as backup to the Nogales officers.  (Doc. 76 ¶¶ 48–49.)  Bunting maintained visual contact with Cockrum in Nogales and observed Cockrum run multiple red lights.  (*Id.* ¶ 50.)

Grand Avenue is a busy street with congested intersections and there are usually some pedestrians.  (Doc. 79 ¶ 21; Doc. 94 ¶ 21.)  Cockrum ran a red traffic light at Grand and Country Club going between 35 and 40 miles per hour, then stopped for a red light at Grand and Reed.  (Doc. 79 ¶ 22; Doc. 94 ¶ 22.)  Other officers arrived at intersections on Grand ahead of Cockrum to clear them as much as possible of vehicular and pedestrian

traffic before the semi arrived.  (Doc. 79 ¶ 23; Doc. 94 ¶ 23.)  Cockrum ran another red light at Grand and Mariposa, one of the busiest intersections in Nogales, traveling at a speed between 35 and 40 miles per hour while occupying both lanes of traffic.  (Doc. 79 ¶ 24; Doc. 94 ¶ 24.)

Defendant NPD Chief Roy Bermudez was on foot at the Grand-Mariposa intersection and made eye contact with Cockrum as he ran the red light, describing the interaction as follows: "I observed [the semi] approaching and raised my hands to the driver in a gesture of, 'What the hell?' The driver looked me in the eyes, made an obscene gesture (commonly known as 'flipping the bird') and continued driving."  (Doc. 79 ¶ 25; Doc. 94 ¶ 25.)  Shortly after running the red traffic light at Mariposa and Grand, Cockrum turned into the Walmart parking lot from the Grand Avenue access road south of White Park Drive and hit the median, causing a tire on the first rear axle to go flat.  (Doc. 79 ¶ 28; Doc. 94 ¶ 28.)  The Nogales Walmart was busy on the date of the incident.  (Doc. 79 ¶ 29; Doc. 94 ¶ 29.)

Cockrum pulled the semi up in front of the west entrance to the Walmart, stopped, and pulled the curtains inside the cab of the truck closed so that officers could not see what he was doing inside.  (Doc. 79 ¶ 30; Doc. 94 ¶ 30.)  Officers were yelling commands for Cockrum to get out of the truck.  (Doc. 79 ¶ 31; Doc. 94 ¶ 31.)  Officer Pimienta attempted to open the driver's door to the truck, but it was locked.  (Doc. 79 ¶ 32; Doc. 94 ¶ 32.)  The NPD officers present at the scene attempted to disable the semi in a number of ways, including cutting the air hose/brake line causing the brakes to the trailer to seize; placing a spike strip in front of the trailer tires; breaking out one of the rear windows of the truck cab; and attempting to deploy a flashbang distraction device.  (Doc. 79 ¶¶ 33–35; Doc. 94 ¶¶ 33–35.)

Many of the officers deployed their duty firearms and aimed them at the semi and its driver because of the threat it posed and out of concern over what the driver might be doing out of view inside the cab of the truck.  (Doc. 79 ¶ 36; Doc. 94 ¶ 36.)  Despite the trailer brakes being locked up, Cockrum began to pull forward towards the parking lot exit

1    onto White Park Drive, an area where there were many civilians and two NPD vehicles

2    were parked to block egress in that direction.  (Doc. 79 ¶ 37; Doc. 94 ¶ 37.)  As Cockrum

3    began to pull forward it appeared to some of the officers that he was shooting through the

4    window of the truck because the window was shattered by other officers.  (Doc. 79 ¶ 38;

5    Doc. 94 ¶ 38.)  Detective Bunting and Officer Pimienta planned to use a non-lethal grenade

6    to distract Cockrum and remove him from the vehicle, so Officer Pimienta broke the glass

7    of the passenger side window, but before the officers could deploy the grenade, Cockrum

8    began driving forward once again.  (Doc. 76 ¶ 59.)

9    Acting Lieutenant Acevedo, Sergeant Gallego, Corporal Batriz, Detective Lopez,

10    and Officer Gomez ensured they had a safe back stop and each fired at Cockrum as he

11    moved towards the two NPD vehicles blocking the parking lot exit in order to stop what

12    they perceived to be an imminent deadly threat to the lives of law enforcement officers and

13    civilians.  (Doc. 79 ¶ 39; Doc. 94 ¶ 39.)

14    Officer Villa shot at the vehicle's tires and attempted to disable it while it was

15    heading for another officer as it was leaving the Walmart.  (Doc. 79 ¶ 40; Doc. 94 ¶ 40.)

16    Cockrum was not deterred by the shots and kept heading for the exit, where he impacted

17    the two NPD patrol vehicles in order to get through to White Park Drive.  (Doc. 79 ¶ 41;

18    Doc. 94 ¶ 41.)  Cockrum proceeded down White Park Drive and turned south onto Grand

19    Avenue where he was pursued by law enforcement officers, including NPD Chief

20    Bermudez, Sergeant Gallego, Corporal Batriz and Officer Pimiento who, once they were

21    able to get in front of Cockrum in an area with a safe backstop, together with Santa Cruz

22    Sheriff's Deputy Bunting, shot at Cockrum again, ultimately causing the semi to come to a

23    stop.  (Doc. 79 ¶ 42; Doc. 94 ¶ 42.)[3]  One of the shots was fatal and it is believed the fatal

24    shot was one of the shots fired by Chief Bermudez.  (Doc. 79 ¶ 42; Doc. 94 ¶ 42.)  Law

25

26    [3] Detective Bunting took up a position in front of Cockrum's vehicle, put his hand
      in the air and commanded Cockrum to stop his vehicle, saying "Stop. Police," and when

27    Cockrum did not stop, he used a Colt M4 Commando, serial number #A0203009 with .223
      caliber ammunition and opened fire while hearing other officers fire as well. (Doc. 76 ¶¶

28    65-71.)

enforcement officers removed Cockrum, who was wearing brass knuckles, from the cab of the truck and attempted CPR, but Cockrum was declared deceased at the scene.  (Doc. 79 ¶ 43; Doc. 94 ¶ 43.)

The Arizona Department of Public Safety (DPS) investigated the incident and issued a report that found each of the members of the NPD who fired at Cockrum were justified in using physical force and deadly physical force against Cockrum because his actions threatened deadly physical force against law enforcement officers, placed law enforcement officers and civilians in reasonable apprehension of imminent physical injury or death, and through his past and present conduct was known to likely endanger human life or inflict serious bodily injury unless apprehended without delay.  (Doc. 79 ¶ 44; Doc. 94 ¶ 44.)

DPS found officers fired 146 shots total between Scene One (Border Patrol Checkpoint), Scene Two (Walmart Parking Lot), and Scene Three (Grand Avenue).  (Doc. 76 ¶ 81.)  As part of the investigation, the Pima County Office of the Medical Examiner (OME) conducted an autopsy and toxicological screening of Cockrum's body, which indicated Cockrum had Benzoylecgonine—the primary metabolite of cocaine—in his system at the time of death.  (*Id.* ¶ 82–88.)

**V.    Discussion**

    **A.    Fourth Amendment Excessive Force Claims against Defendants Gallego, Batriz, Pimienta, Bunting, and Bermudez in Count One**

        **1.    Legal Standards**

            **a.    Excessive Force**

If the alleged use of excessive force was applied during the plaintiff's arrest, the Fourth Amendment objective-reasonableness standard applies.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Under this standard, a court considers certain objective factors and does not consider the defendant officer's intent or motivation.  *See id.* at 397, 399 ("subjective concepts like 'malice' and 'sadism' have no proper place in [this] inquiry").

Under the Fourth Amendment standard, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  When determining whether the totality of the

circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The inquiry is "whether the officers' actions are 'objectively reasonable' considering the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted).

### b.    Qualified Immunity

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis formerly required the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201–02.

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quotation omitted). While a case need not be directly on point, existing precedent must "place the statutory or constitutional question beyond debate." *Id.* (cleaned up). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal citations omitted). "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal citation omitted). "While a case addressing general principles may clearly

establish a right in an obvious case, such obvious cases are rare." *Id.* (cleaned up).  "[T]his obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context" "because a categorical statement that conduct obviously violates the Fourth Amendment is particularly hard to make when officers encounter suspects every day in never-before-seen ways, including countless confrontations that yield endless permutations of outcomes and responses." *Id.* (cleaned up).  As such, Fourth Amendment violations must be beyond debate to be considered obvious.  *Id.* (citation omitted); *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021) ("Because excessive use of force is a highly fact-specific inquiry, even when we determine excessive force was used, 'police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.'") (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

"Instead, a clearly established right usually requires controlling authority or a robust consensus of cases of persuasive authority." *Id.* (citations omitted).  "Plaintiffs must either explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.*  With regard to the "reasonableness of lethal force as a response to vehicular flight, . . . this is an area in which the result depends very much on the facts of each case." *Plumhoff*, 572 U.S. at 777.  The Court must "view the facts as an officer would have encountered them on the night in question, not as an ex post facto critic dissecting every potential variance under a magnifying glass." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

### 2.   Analysis

#### a.   Batriz, Pimienta, and Gallego's Arguments

Defendants Batriz, Bermudez, Pimienta, and Gallego argue that they are entitled to summary judgment on Plaintiffs' excessive force claims because they did not violate Cockrum's constitutional rights and they are entitled to qualified immunity because the law was not clearly established that they could not shoot at Mr. Cockrum in the semitruck under

1    the circumstance of this case.

2        Specifically, Defendants argue that when balancing the factors articulated in

3    *Graham*, the force used was objectively reasonable because Cockrum engaged in

4    aggravated assault on law enforcement officers and presented a deadly threat to law

5    enforcement officers and the public, multiple attempts were made to stop him before the

6    Border Patrol station, at the Border Patrol station, before he entered the City of Nogales, at

7    Walmart, and then as he left the Walmart, and Cockrum was actively attempting to evade

8    felony arrest by flight.  Defendants further argue that every case to consider a similar

9    situation has found that the officers acted reasonably, and it was not clearly established that

10   the officers could not take the actions they did under these circumstances.

11       In Response, Plaintiff argues that Defendants Batriz, Bermudez, Pimienta, and

12   Gallego used excessive force when they shot at Cockrum at the final location along Grand

13   Avenue because none of the four officers who fired along Grand Avenue claimed that they

14   were in harm's way.

15       In Reply, Defendants assert that Plaintiff misrepresents the threat posed by Cockrum

16   at the time of the shots.  Defendants point to Officer Pimienta's deposition testimony where

17   he described Mr. Cockrum's truck just before he shot:

18           I mean, he was – that truck was dragging that trailer with flat
             tires like it was nothing. So I'm, you know, I'm thinking he's
19           basically driving a Howitzer shell down and it's only a matter
             of time before he winds up hitting or killing someone. So my
20           frame of thought was I have to stop him. He can't leave that
             location at all. I mean he had already rammed one of our patrol
21           cars and just by rubbing it. I remember driving by and just
             seeing, like, the fender just peeled back. . . .  He's going to kill
22           someone. That's, I mean seeing – seeing how he just peeled the
             – the fender back it just – it reminded me of those old tuna cans
23           – with no force at all. I mean just ripped it off, kept going,
             dragging that trailer like it was nothing, like, it was, you know,
24           a wagon tied to a car. I was like, "Nah, this – this guy is going
             to kill someone, we need to stop him. We need to stop him as
25           quickly as we can before that happens."

26
27

28   (Doc. 88-1 at 38, 41.).

1   Defendants assert that at the time of the shooting Batriz and Pimienta knew: (1) a
2   Border Patrol agent told them that Cockrum was "armed and dangerous"; (2) Cockrum
3   almost ran over Deputy Ainza and Deputy Ainza had fired shots at the semi's tires; (3)
4   Cockrum committed felony flight in violation of A.R.S. § 28-622.01 by refusing to stop
5   for law enforcement vehicles for an extended distance; (4) Cockrum had sped through a
6   construction zone, ran red lights in city limits, and continued driving recklessly in Nogales
7   City limits; (5) Cockrum pulled the curtains in his truck to prevent officers from viewing
8   what he was doing inside the truck; (6) Cockrum continued to attempt to flee and evade
9   law enforcement despite attempts to disable his vehicle by flattening multiple tires on the
10  truck and trailer, cutting the brake lines to lock up the brakes on the trailer, and law
11  enforcement officers already shooting at him as he left the Walmart parking lot moments
12  earlier; (7) Cockrum had crashed through two law enforcement vehicles to gain access to
13  the exit of the Walmart parking lot and continued to drag the trailer with locked up brakes
14  and flat tires towards the congested Nogales downtown and border crossing area.
15  Defendants assert that Chief Bermudez and Sgt. Gallego witnessed many of these events
16  and heard some information over the radio.

17  Defendants assert that Cockrum was committing dangerous felony flight in
18  violation of A.R.S. § 28-622.01(1) and allowing Cockrum to continue to travel on public
19  streets within City limits posed an imminent risk of death or serious bodily injury to persons
20  on or near city streets.  Defendants assert that Gallego and Bermudez were aware through
21  radio communications of much of what had occurred with Cockrum prior to when he
22  entered Nogales, they were witnesses of what occurred as he travelled south on Grand
23  Avenue after exiting I-19 and then his actions in the Walmart parking lot and his further
24  actions as Cockrum dragged the trailer back onto Grand Avenue and headed towards
25  downtown Nogales.

26  Defendants assert that Plaintiff does not discuss the *Graham* factors or explain how
27  the constitutional questions are beyond debate.

28  Defendants argue that, at the time of the shooting, the evidence shows other vehicles

in the vicinity of Cockrum's vehicle, the officers testified that the area south of the Walmart on Grand, including downtown Nogales and the border crossing, was busy with pedestrian and vehicular traffic around 1:50 p.m. on a weekday, the officers are familiar with this area and able to speak to what would be normal amounts of expected traffic and pedestrians on a normal day.   Defendants assert that it was Cockrum's own refusal to yield to law enforcement, his insistence on continuing his unlawful flight by ramming law enforcement vehicles after passing through a fusillade of bullets (that Plaintiff does not dispute was justified) only moments before the fatal shots on Grand Avenue, that forced the final outcome, the truck was not disabled, and was pulling the trailer "like it was nothing," "like it was a wagon tied to a car . . ."

Batriz described what occurred during this 90-second interval:

> Um, the semi, I - like I said, I ran after the semi on foot thinking if he hits Sergeant (Bermudez)'s unit, it's gonna slow him down. I'm gonna run-up to the driver's side and use lethal force again to stop - stop the driver. That was my thought. I need to stop him from hitting more people or shooting again because I thought he had shot.[4] It looked like he had shot from inside the truck. He hits - he hits the patrol vehicle but at an angle. He doesn't hit it straight. He tried - he moved his truck out of the way. But he catches it with the back end of the truck or the trailer. I don't know exactly because of the angle that I had. He hits the unit and then proceeds north through the parking lot and then makes another right turn on White Park Drive. At that point, I had seen all the trailer - well the trailer didn't have air brakes. So it was, you know, the tires weren't – weren't functioning right. There was . . . He's dragging the trailer, yes. He's dragging it. It was actually positioned kind of weird when he turned towards White Park. The trailer wasn't moving normally like it normally would. It wasn't turning. He was turning. The truck was turning. And the trailer was like positioned oddly. I don't - I don't know how to describe it, but the truck is basically facing east to west and the trailer is like north, northeast-ish. I don't know. It just didn't look right. It didn't look like he had control of the trailer at all. He turns to

---

[4] As noted above, some officers mistakenly believed that Cockrum was shooting when other officers broke the drivers' side window of the semitruck.

White Park. I noticed Officer (Pimienta) drove up in his unit at this point. He yells at me to get back in the patrol car. I run around the car, get in the passenger side again. We proceed after the vehicle. We turn to White Park, make the right turn. At this point, the semi's already reaching White Park and Grand and there was a red truck stopped at the red light in the turning lane, the left turning lane. He was going straight towards the truck and I told Officer (Pimienta), "He's gonna hit that truck." I didn't see any lights and sirens on the truck, so I assumed it was a civilian. We proceeded after the truck, the semitruck, and I noticed that the tires, some of the tires were blown out. Ah, we did see an officer. I think it was Officer - no, it was Officer (Rene Lechuga) on the corner of White Park and Grand. I told Officer (Pimienta) to get close to the semi, but since Officer (Lechuga) was pointing his rifle at the semi, we didn't want to have that crossfire. Officer (Pimienta) slowed down. The semi passed, made another right turn on to Grand Avenue, and then we proceeded after we saw that Officer (Lechuga) didn't shoot his weapon. We proceeded after the semi and there was high traffic. The semi was blocking all of the southbound lanes because of the trailer and how it was turning. So at that point, the chief's unit, Chief (Bermudez), made a turn into - onto Grand Avenue, but on the northbound lanes to make its way towards the semi. I told Officer (Pimienta), "Follow, follow the chief or the chief's unit," because we didn't see who was driving to be honest. Well, I didn't. We followed through the northbound lanes. We we- weaved in and out of traffic and we drove up clearing the – there's a center divider there on Grand and White Park. We drove past it as the semi was parallel to us. We drove past the semi a bit and the - the center divider into the median as a semi was approaching. We're passing that same entrance he went into through the Walmart on Grand Avenue. Got off - I got off my patrol vehicle and I proceeded to shoot into the driver's side door. I do remember seeing what I thought was the driver's head on the driver's side window, partial - like a partial, the top of his head, I would say, from the ear, the top of the ear up. And that's what gave me my target. I shot at the door thinking I'm gonna shoot him on his - not center mass, but on his body, hopefully stopping this truck and, you know, stopping any other further damage or any other harm to any other civilians, possible, you know, danger to the public. That was my concern was the - him running over somebody or hitting a car or hurting somebody, a civilian.

1    (Doc. 88-1 at 69-70.)  Defendants assert that the 90-second period between when Cockrum

2    began pulling out of the Walmart and the first shots were fired, and when the shots were

3    fired on Grand Avenue was a rapidly evolving chaotic maelstrom as officers rushed to

4    contain the threat Cockrum created.

5                    **b.    Arguments related to Bermudez and Bunting**

6            The Parties cross-move for summary judgment as to the excessive force claims

7    asserted against Bermudez and Bunting in Count One.

8            Plaintiff argues that she is entitled to summary judgment against Defendants

9    Bermudez and Bunting on the excessive force claim because Officers Bunting and

10   Bermudez were not in fear for their safety, they fired their weapons from the side, chased

11   after a fleeing Mr. Cockrum in the moment before shooting, and raced ahead of Mr.

12   Cockrum's lumbering truck with the goal of staging themselves for a shootout.  Plaintiff

13   asserts that although Bermudez and Bunting explained to investigators that they primarily

14   feared for the safety of civilians who may come into contact with Mr. Cockrum and his

15   large truck, they did not identify a single pedestrian or civilian vehicle that was in the path

16   of Mr. Cockrum's southbound truck along Grand Avenue, which is a speculative danger

17   that cannot serve as the basis for deadly force under the Fourth Amendment.

18           Plaintiff further argues that Cockrum's past actions could not be used to justify the

19   deadly force and that "all the evidence available to Detective Bunting and Chief Bermudez

20   suggested that Mr. Cockrum intended no harm with his truck and that he merely wished to

21   escape the grasp of the pursuing officers."  Plaintiff asserts that Cockrum "was accused

22   merely of flashing a knife earlier in the day, at a distance from the individuals who

23   perceived a threat. . . . at least one of the knives had been discarded while Mr. Cockrum

24   was traveling along the interstate, long before he reached the location where officers

25   opened fire on him [and] [o]fficers knew this fact before the shooting began."  Plaintiff

26   asserts that the large number of pedestrians that officers were originally concerned about

27   in the Walmart Parking Lot were non-existent on Grand Avenue (a four-lane highway),

28   there were also no civilian vehicles traveling in the immediate vicinity of Mr. Cockrum in

the two southbound lanes, Mr. Cockrum's truck was traveling slowly along Grand Avenue, with the brakes of the trailer fully engaged and forcing the trailer to essentially drag along the pavement, and any theoretical threat to civilians that may have existed along Grand Avenue had been eliminated by Detective Bunting's 28 shots just seconds before Chief Bermudez opened fire.

Plaintiff claims that Chief Bermudez started firing after Detective Bunting independently perceived that his own gunshots were "effective" at reducing the speed of Mr. Cockrum's truck and even if Detective Bunting had reasonably perceived a threat in the moment that he fired his 28 shots, Plaintiff is still entitled to judgment with regard to the reasonableness of Chief Bermudez's 13 gunshots.

In Response, Defendants argue that responding with deadly force to the threat Cockrum posed was not a Fourth Amendment violation and the law is not clearly established that any actions against Cockrum violated the Fourth Amendment. Defendants assert that Cockrum's encounter with law enforcement began with him threatening a civilian and a deputy with a knife, he then led law enforcement officers from three different agencies (Santa Cruz County Sheriff's Department, Border Patrol, and Department of Public Safety) on a several mile chase on northbound I-19 to the border patrol checkpoint where he almost ran over a Border Patrol agent and a Sheriff's Department detective while turning around in the median to head southbound on I-19, where he sped through a construction zone, and bypassed patrol cars blocking access to the city of Nogales, then drove recklessly on Nogales city streets, running red lights and reaching speeds as high as 55 mph before turning abruptly into a Walmart parking lot where he struck a curb and then parked in front of the store. Defendants assert that Cockrum pulled the blackout curtains inside the cab of the truck to prevent officers from seeing what he was doing inside; Officers yelled at Cockrum to get out of the truck and tried to open the driver's side door, but it was locked; other officers cut the air hose between the truck and the trailer locking the trailer brakes and placed a spike strip in front of the trailer's tires in an effort to disable the vehicle; other officers tried to break a window in the back of the truck and deploy a

flashbang distraction device, but before they could complete their attempt, Cockrum began heading for the exit through the busy parking lot.

Defendants assert that at this point, officers opened fire to attempt to stop the vehicle from continuing, and it appeared to some of the officers that Cockrum was shooting at them from inside the vehicle as the windows shattered from other officers' shots, but even with the trailer brakes locked and multiple tires flat, Cockrum continued towards the exit, ramming two police vehicles placed there to block the semi and pushing them out of the way, other vehicles swerved to avoid a collision as Cockrum proceeded back towards Grand Avenue, heading south towards the center of Nogales and the congested border crossing area. Defendants assert that Bunting, Bermudez, Gallego, Batriz, and Pimienta traveled down Grand Avenue and stationed themselves in front of Cockrum's semi, exited their vehicles and took up positions where they could fire at the semi with a hill behind it as a safe backstop. Bunting, Gallego and Batriz had rifles, and they and Chief Bermudez all began firing at approximately the same time, Chief Bermudez with a pistol. Officer Pimienta also had a pistol and waited slightly longer before he began firing, but all of the law enforcement officers stopped firing at approximately the same time, as the semi finally stopped.

Defendants assert that Cockrum's actions threatened to harm civilians in the area demonstrated by his refusal to stop his eighteen wheel semi trailer truck and his demonstrated willingness to ram vehicles out of his way so he could continue his determined and sustained attempts to evade arrest by flight even after multiple efforts by law enforcement to stop and disable his vehicle. Defendants assert that Plaintiff is incorrect that Cockrum drove at or below the speed limit as he exceeded the speed limit through construction zones on I-19 and in Nogales City limits, and he also ran stop lights, rammed patrol vehicles, and refused to stop for law enforcement officers. Defendants assert that Cockrum dragging a trailer with locked brakes and flat tires after being shot at and having to ram patrol vehicles out of the way to exit the Walmart parking lot demonstrated that he was undeterred by efforts to stop him and remained determined to avoid law enforcement

1    at all costs, showing the level of threat he presented to officers and the public.

2            Defendants assert that Plaintiff's theory that Chief Bermudez may still be liable even

3    if Detective Bunting is not is based on the false premise that Detective Bunting fired first,

4    and had stopped firing and the truck had come to rest before Chief Bermudez or any of the

5    Nogales officers began firing, but there is no evidence to support such a claim, and Plaintiff

6    cites the interview transcript of Detective Bunting to support this claim, but the transcript

7    only states that Detective Bunting did not hear the other officers firing until after he stopped

8    firing himself, which is not evidence of when Bermudez started shooting.   Defendants

9    assert that Pimienta described Bunting, Bermudez, Batriz, and Gallego all shooting at the

10   same time, with himself beginning to shoot shortly after the rest of them and Chief

11   Bermudez stated in his Declaration: "I stopped firing when the truck stopped moving" and

12   Gallego testified that "Once the semi stopped, all shooting ceased."  (Doc. 79-1 at 6; 79-3

13   at 7.)

14           Defendants further assert that the expert report commissioned by the Santa Cruz

15   County Sheriff's Office Defendants concluded that all three law enforcement officers who

16   were firing rifles, Bunting, Batriz, and Gallego, were standing in similar locations, and

17   engaged the truck in similar locations as it came towards them, all beginning to fire at

18   around the same time, and terminating their fire at approximately the same time, based on

19   the locations of bullet holes in the truck caused by rifles.  That report concluded that rifle

20   shooters who were positioned north of the truck (as it passed by) did not continue to shoot

21   into the truck from behind the driver's door area.  Defendants additionally assert that the

22   video submitted by Plaintiff shows officers firing as the truck comes to a stop, with all

23   shots stopping within a couple of seconds of the truck coming to a complete stop.[5]

24   Accordingly, Defendants assert that the evidence confirms that all of the officers fired

25   within seconds of each other, and all terminated their fire within 2-3 seconds of the semi

26   coming to a complete stop, and there is no evidence of two separate volleys or a separate

27

28   _____

         [5] The video submitted by Plaintiff confirms this.

volley after the semi came to a stop and Cockrum gave up; rather the video shows officers running over to the semi and removing Cockrum within seconds of the shots ceasing.

With regard to Bunting,[6] Defendants assert that Bunting personally observed what he reasonably believed was Cockrum's attempt to run down a United States Border Patrol agent on Interstate 19 at the checkpoint, and he observed Cockrum run red lights on city streets while driving a large, heavy semitruck with trailer, and Cockrum smash through NPD vehicles "like nothing" to escape the Walmart parking lot.  Bunting asserts that Cockrum posed a continuous and immediate threat to the community and Plaintiff's argument that Detective Bunting could not "identify a single pedestrian or civilian vehicle that was in the path of Mr. Cockrum's southbound truck along Grand Avenue" is misleading because even if there were not vehicles in view in the southbound lanes of travel, there were vehicles in the northbound lanes of travel, and there is no raised median or barrier separating the southbound and northbound travel lanes.

Bunting asserts that officers employed a variety of less-lethal means to attempt to stop Cockrum's rampage, including Deputy Soto's first attempt to make peaceful contact, only for Cockrum to draw a knife and make a throat slitting motion, Officers used flashing lights and sirens to attempt to have Cockrum pull over and surrender, Border Patrol agents threw down stop sticks to puncture Cockrum's tires, Detective Ainza shot at Cockrum's tires to deflate them, NPD officers threw up roadblocks on the Interstate 19 exit ramps that Cockrum ignored, Officers in the Walmart parking lot cut the air hoses and attempted to toss a non-lethal stun grenade into Cockrum's cab, but none of these measures succeeded at stopping Cockrum.  Bunting asserts that he ordered Cockrum to stop, but Cockrum did not stop, and after Bunting caught up with Cockrum on Grand Avenue, Bunting drove

---

[6] Defendants assert an alternate argument that Cockrum was never "seized" by Bunting within the meaning of the Fourth Amendment because none of his shots ever hit Cockrum.  There is no dispute that Bunting fired into Cockrum's vehicle.  As such, there is a disputed issue of material fact as to whether any of Bunting's shots hit Cockrum. Because the Court decides the Motion on other bases, the Court will not further discuss this argument herein.

ahead of him, exited his marked Santa Cruz County Sheriff's Office vehicle, and stood where Cockrum could see him, put his hand up and said "Stop. Police." But Cockrum still did not stop.  Defendants assert that Detective Bunting waited to shoot until he knew he had a safe backdrop that would not expose other officers or civilians to his shots, and he acted reasonably and there is no clearly established law demonstrating that Bunting did not act reasonably.

Bunting asserts that in assessing the *Graham* factors, only the first factor regarding the amount of force inflicted would favor Plaintiff, but the remaining factors favor Defendant Bunting because Cockrum committed multiple acts of aggravated assault by brandishing a knife at H&M Distributor employees and then again at Deputy Soto in the Malena Produce parking lot, he engaged in felony flight from a law enforcement vehicle and committed reckless endangerment by swerving his truck towards Corporal Flores while leaving Malena Produce, by nearly striking a Border Patrol agent at the Border Patrol checkpoint, and by smashing police vehicles out of his way in a crowded Walmart parking lot, Detective Bunting heard about the incident at Malena Produce over the radio, and personally observed Cockrum at the Border Patrol checkpoint, down Interstate 19, at the Walmart parking lot, and on Grand Avenue.  Detective Bunting observed Cockrum continuing to drive his large tractor-trailer down Grand Avenue, he saw Cockrum drive his vehicle through two NPD SUVs even after officers took steps to disable Cockrum's vehicle, and he gave clear, unambiguous commands to Cockrum to stop, but Cockrum continued driving forward.

Defendants assert that with these facts, it was reasonable for Detective Bunting to conclude Cockrum posed an imminent threat to the public, thus justifying the use of deadly force.

In Response, Plaintiff asserts that several of Cockrum's "supposed dangerous crimes" took place as much as 67 minutes before Bunting made the considered decision to use deadly force, and Detective Bunting knew that Mr. Cockrum had a knife, but didn't "know how the knife was involved," Bunting did not know about the near-collision with

Deputy Flores, and the two police vehicles that Cockrum smashed into were unoccupied and Cockrum hit them "only after Nogales police officers opened fire upon him and intentionally placed the vehicles in his way."

In Reply, Bunting asserts he knew Cockrum barricaded himself with a knife before fleeing, he observed Cockrum illegally turning through a median and believed Cockrum struck a Border Patrol agent, he followed Cockrum's felony flight from law enforcement, dodging around NPD vehicles, and running red lights and smashing through two other NPD vehicles "like nothing" after less than lethal attempts to stop him failed. Bunting asserts that there were motorists present in the northbound lanes on Grand Avenue as Cockrum proceeded southbound and Bunting reasonably concluded Cockrum was an immediate threat because the weight of the truck was more than sufficient to push through police SUVs "like nothing" even after officers cut air lines and deployed spike strips, and Bunting knows the busy nature of Downtown Nogales based on his own personal experience as a 19-year veteran of the Santa Cruz County Sheriff's Office, an area that geographically includes Nogales. As a result, Detective Bunting asserts that his actions did not violate Cockrum's Fourth Amendment rights.

### c.   Whether the Law was Clearly Established

### i.   Arguments

Plaintiff argues that the law was clearly established that the officers could not shoot when they did and relies on *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) for the proposition that "an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him" and asserts "[t]hat is precisely what happened here." Plaintiff asserts that each officer raced ahead of Mr. Cockrum's truck with the goal of staging himself for a shootout and stood 12-15 feet to the east of the truck while it was traveling southbound. Plaintiff also cites *Adams v. Speers*, 473 F.3d 989, 992 (9th Cir. 2007), *Villanueva*, 986 F.3d at 1172, and *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1148 (9th Cir. 1996) to support her contention that the law was clearly established that the officers could not shoot

at Cockrum when they did. Plaintiff further argues that to the extent that Defendants Bermudez, Batriz, Gallego, and Pimienta relied on Mr. Cockrum's past actions to predict how he might behave toward civilians, such reliance was unreasonable pursuant to *A.D. v. California Highway Patrol*, 712 F.3d 446, 451 (9th Cir. 2013), which held that officers cannot use deadly force to neutralize a future threat. Plaintiff asserts that there is no indication that there were any oncoming cars at either of the two intersections at which Mr. Cockrum ignored the red lights, he obeyed at least one red light during the same time period, on Grand Avenue, he never exceeded 40 mph, and he maneuvered around a roadblock instead of going through it. Plaintiff further asserts that Defendant Bermudez "had no idea what had transpired" before he returned to his patrol vehicle from his lunch break and Defendant Pimienta was unaware that Mr. Cockrum had brandished a knife at the produce warehouse an hour earlier. Plaintiff asserts that the evidence shows that the officers were not motivated by public safety at the time of the shooting because Cockrum's truck was moving very slowly, and Pimienta knew the truck was not in gear and that it was dragging a trailer. Plaintiff further asserts that the officers did not spot a single pedestrian along Grand Avenue at the time they opened fire, and Cockrum was 3.2 miles away from the central business district where there were generally pedestrians, but the Defendant officers did not possess "real-time information about the presence or absence of pedestrians located more than three miles away."

Plaintiff argues that even if Defendants had identified specific pedestrians in Mr. Cockrum's immediate path and even if a reasonable jury were to treat Mr. Cockrum's "badly-hobbled truck as a weapon," the "mere possession of a weapon is insufficient to justify the use of deadly force" under *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1013 (9th Cir. 2017) and *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1001 (9th Cir. 2020).

Plaintiff further asserts that Pimienta radioed to request authorization for deadly force five minutes prior to shooting, but never received a response and Bermudez, who had "no idea" what Cockrum did, thought to himself "that truck needed to be stopped at all

costs."

Plaintiff further argues that while there exists clearly-applicable Ninth Circuit caselaw, this case may additionally fall within that narrow class of circumstances in which a constitutional right is deemed to be clearly established even without a body of relevant case law.

Plaintiff asserts that every circuit to have considered a Fourth Amendment claim against an officer firing into a slow-moving vehicle from the side has found a constitutional violation (citing *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003); *Abraham v. Raso*, 183 F.3d 279, 293–94 (3d Cir. 1999); *Cordova v. Aragon*, 569 F.3d 1183, 1195 (10th Cir. 2009); *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019)).

Defendants argue that the cases cited by Plaintiff to establish that the constitutional right was clearly established are clearly distinguishable from the facts of this case. Defendants assert that the Supreme Court has never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity.  They argue that there is no case from the Ninth Circuit or Supreme Court that clearly establishes a constitutional violation under facts analogous to those faced by Defendants: where a suspect who had committed multiple felonies, refused to stop for law enforcement, plowed through two law enforcement vehicles, and despite clear instruction to stop by Detective Bunting, continued to barrel onward in a tractor-trailer toward a downtown area and the US-Mexico border, endangering the public.

Plaintiff asserts that the Ninth Circuit regularly finds that officers act unreasonably in shooting at motorists who are actively fleeing, and here Mr. Cockrum's truck was incapable of engaging in a high-speed chase because its trailer had been disabled.

### ii.  Discussion

Plaintiff has not met her burden of showing that the law was clearly established such that the officers knowingly violated the Fourth Amendment when they shot at Cockrum

and his eighteen wheel semi-trailer truck as it attempted to exit the Walmart parking lot. The cases cited by Plaintiff are simply too attenuated to demonstrate that the law was clearly established.

"The [Supreme] Court has . . . never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Mullenix v. Luna*, 577 U.S. 7, 13–15 (2015).

In *Villanueva*, police officers in an unmarked police car observed a pickup truck performing an illegal maneuver in a parking lot at 10:35 p.m., and the officers entered the parking lot with the intention of performing a stop. 986 F.3d at 1163. The unmarked police car had amber lights and an unusual siren and when the officers pursued the pickup truck, the pickup truck driver exited the parking lot at a speed that did not "feel fast." *Id.* Still being pursued by the unmarked police car, the driver of the truck drove 50 to 70 miles per hour on surface streets and ran at least three red lights. (*Id.*) The pickup truck then entered a dead end street and came to a stop. *Id.* The police officers exited their vehicle and drew their firearms; one stood near the open driver's side door of the police car and the other stood near the open passenger's door. (*Id.*) At the same time, the driver of the pickup attempted to reverse out of the street in a three-point turn that resulted in the rear of his vehicle pointing toward a dead-end and the front generally facing the officers, who were approximately 15 to 20 feet away. *Id.* The officers then opened fire on the vehicle and shouted a warning of some kind at the same time or within a second of firing. *Id.* The shots killed the driver and injured the passenger. *Id.*

The Ninth Circuit Court of Appeals found that the police officers were not entitled to qualified immunity because it was "clearly established that an officer violates a person's constitutional rights by shooting at a slow-moving vehicle that the officer could reasonably have side-stepped to remove himself from danger." *Id.* at 1173.

*Villanueva* is distinguishable from the facts before the Court. The driver in *Villanueva* was merely performing an illegal driving maneuver in a parking lot, was not driving a large eighteen wheeled semi trailer truck, possibly did not know he was being

pursued by a police vehicle, and the police in *Villanueva* gave no warnings or orders prior to shooting and made no other attempts to stop the vehicle prior to opening fire. While the emphasis in *Villanueva* was placed on the vehicle being a slow-moving car, it did not involve an eighteen wheel semitruck pulling a large trailer, which even at slower speeds poses more danger than a pickup truck. And there was no argument in *Villanueva* that the driver posed a risk to the general public, especially where officers tried nothing but deadly force to stop the pickup truck, which was entirely blocked by police cars.

Here, officers attempted to stop Cockrum and the semitruck on several occasions and in various ways, but Cockrum showed a reckless disregard for the lives of the officers and the public as he drove through the police vehicles that attempted to block his path. Moreover, at the time the officers used deadly force on Cockrum, he was driving his semitruck onto a road where there were other vehicles, and it was the middle of the day where other motorists were expected to be at that time. The *Villanueva* Court noted "we have found use of deadly force against a stopped or slow-moving vehicle reasonable only when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle." *Id.* at 1170. Here, Cockrum was trying to evade arrest in an aggressive manner and, although the police themselves had slowed the semitruck down to some degree by disabling the trailer, but not disabling the truck itself, Cockrum was nonetheless still aggressively driving through police cars in an attempt to evade arrest.

Plaintiff's arguments that the police could not use deadly force until the moment Cockrum was going to kill a pedestrian are likewise not supported by the case law. Indeed, the Supreme Court has recognized an open question as to whether an imminent, but not immediate, threat to members of the public or to police officers could support the use of deadly force. *Mullenix*, 577 U.S. at 14 (discussing cases and noting "[t]he threat [a driver who was engaged in a high speed chase and threatened to kill police officers] posed was at least as immediate as that presented by a suspect who had just begun to drive off and was headed only in the general direction of officers and bystanders"); *see also Monzon*, 978 F.3d at 1161 ("While *Plumhoff* may instruct us that Monzon's reckless, high-speed driving

posed a severe enough threat to public safety to itself justify the use of deadly force, we need not reach that issue because here the use of deadly force was reasonable to protect the officers whose lives were threatened by the accelerating van.").

In *Plumhoff*, officers pulled over a driver for a headlight violation near midnight and observed that he seemed nervous. 572 U.S. at 768. Rather than produce his driver's license at the officer's request, the driver sped away and, during the police chase, the driver exceeded speeds of 100 miles per hour and passed more than two dozen vehicles. *Id.* at 769. The driver, while exiting the freeway, hit one of the police cruisers, which caused him to spin into another police cruiser. *Id.* The driver attempted to reverse and accelerate his vehicle, but his car was stuck to the bumper of a police cruiser. *Id.* Two officers approached him with weapons drawn and one officer pounded on the passenger side window. *Id.* The driver then "made contact" with another police cruiser and the wheels of the vehicle were spinning and it was rocking back and forth, although it was still stuck. *Id.* One officer then fired three shots into the vehicle and, at that point, the driver was able to pull away, causing an officer to step out of the way of his vehicle. *Id.* As the driver sped away, the officers fired 12 shots into his car, causing the driver to crash into a building. *Id.*

The United States Supreme Court found that the shooting was reasonable, reasoning "[u]nder the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight and that, if he was allowed to do so, *he would once again pose a deadly threat for others on the road*. *[The driver's] conduct even after the shots were fired—as noted, he managed to drive away despite the efforts of the police to block his path—underscores the point*." *Id.* at 776–77 (emphasis added). The Court further stated that the number of shots fired was reasonable because "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* at 777.

The Tenth Circuit's decision in *Cordova* is the case that is most supportive of Plaintiff's position that a police officer may not use the deadly force of a gun to stop an

imminent, but not immediate, threat to the public.[7]  But, *Cordova* is simply not enough to demonstrate that the law was clearly established for several reasons.  First, *Cordova* was decided before *Plumhoff* and its reasoning, at least as it pertains to the situation before this Court, is inconsistent with the reasoning in *Plumhoff*.  *Compare Plumhoff*, 572 U.S. at 779 ("the officers here shot at [the driver] to put an end to what had already been a lengthy, high-speed pursuit that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby") *with Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) ("To the extent that the district court held that the hypothetical risk Mr. Cordova posed to fellow motorists who might happen along was itself enough to render the shooting reasonable, it was in error. The threat must have been more than a mere possibility. The facts show that Mr. Cordova was driving recklessly down the wrong side of the highway. The facts do not, however, show that any other motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves. Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.").

Moreover, even if *Cordova* did find that a pedestrian or officer must be facing immediate, but not imminent danger before a police officer may use a gun in a way that may inflict deadly force, *Cordova* is an out-of-circuit case and cannot be said to constitute the "weight of authority" necessary to show that a right is clearly established.  *See Plumhoff* at 778 (for a right to be clearly established, a Plaintiff must show "controlling authority or a robust consensus of cases of persuasive authority") (citation and quotation marks

---

[7] In *Cordova*, the court, having found a constitutional violation nonetheless granted qualified immunity to the defendant officer on the ground that the right at issue was not clearly established.  *Cordova*, 569 F.3d at 1192–93 ("Given that our precedent does authorize the use of deadly force when a fleeing suspect poses a threat of serious harm to others, Officer Aragon was not unreasonable in believing that a potential threat to third parties would justify such a level of force.").

1   omitted).[8]

2        In *A.D. v. California Highway Patrol*, the Ninth Circuit Court of Appeals found

3   that it was clearly established that "a police officer who acted with the purpose to harm a

4   civilian, unrelated to the legitimate law enforcement objectives of arrest, self-defense, or

5   the defense of others, violated the Fourteenth Amendment due process clause."  712 F.3d

6   446, 451 (9th Cir. 2013).  In *A.D.*, officers were pursuing a stolen vehicle at 2:00 a.m.; the

7   driver of the vehicle was driving on a freeway without headlights at high speeds.  *Id.*

8   Eventually, the driver of the vehicle encountered a dead end.  *Id.*  Police cars surrounded

9   the vehicle and the driver of the stolen car backed into one of the police cars, drove forward

10  and stopped.  *Id.*  A police officer ordered the driver to stop, but she responded "fuck you,"

11  and rammed the police car two more times.  *Id.*  A supervisor ordered all officers onto the

12  sidewalk on the same side of the street, but one of the officers ignored the order, and opened

13  fire on the driver of the stolen car.  *Id.*  The supervisor ordered him to stop, but he continued

14  to fire 12 rounds through the passenger side window killing the driver.  *Id.*  In *A.D.*, unlike

15  here, there was no dispute that the driver of the stolen car was "contained on the street"

16  posing no threat to the public, there was no threat of harm to any of the officers, no threat

17  that at the moment of the shooting, the driver intended to continue, and other officers did

18  not perceive a threat when the shooting commenced.  *Id.*

19       In *Orn v. City of Tacoma*, police officers attempted to pull a driver over for driving

20  without headlights, but the driver, who had a suspended license and had just smoked crack

21  cocaine, ignored the signals for him to pull over and proceeded to drive home.  949 F.3d

22  1167, 1171–72 (9th Cir. 2020).  On the way home, the driver drove 25 to 35 miles per hour

23  and obeyed traffic lights and stop signs.  *Id.* at 1172.  During the pursuit, several officers

24  _____

25       [8] The Court has reviewed the other out-of-circuit cases cites by Plaintiff: *Smith v.*
26  *Cupp*, 430 F.3d 766, 774 (6th Cir. 2005), *Cowan ex rel. Estate of Cooper v. Breen*, 352
    F.3d 756, 763 (2d Cir. 2003), *Abraham v. Raso*, 183 F.3d 279, 293-94 (3d Cir. 1999), and
27  *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019), but the facts of those cases are
28  so dissimilar to the case before the Court they cannot be considered a robust consensus of
    cases of persuasive authority.

1    unsuccessfully attempted to box the driver in, and when the officers attempted to block his

2    path, the driver drove onto a curb and a partially closed road to avoid them, and when the

3    officers laid spike strips, he drove into the lane of oncoming traffic, though no other traffic

4    was present when he did this.  *Id.*  When the driver reached his apartment complex,

5    followed by other police vehicles, he noticed that a police SUV was blocking the exit.  *Id.*

6    He came to a brief stop and the officer driving the vehicle that was blocking the exit stood

7    on the grassy area to the left of his SUV as the driver approached, and the officer had his

8    gun drawn with the barrel pointed toward the ground and repeatedly yelled at the driver to

9    stop.  *Id.*  Rather than heed the command to stop, the driver attempted to squeeze past the

10   police SUV by driving onto the grass at about 5 miles per hour.  *Id.* at 1172.  As he made

11   this attempt, another officer drove behind the SUV to prevent the escape, and the driver

12   turned more, coming into contact with the initial SUV and the second police car blocking

13   his path.  *Id.* The officer who had been standing outside his vehicle then ran toward the

14   driver's vehicle on the passenger side and fired three rounds, striking the driver in the spine

15   causing his body to slump forward and the car began to speed away, at which point the

16   officer fired seven more rounds through the rear windshield.  *Id.*

17           The *Orn* Court noted that the Supreme Court has held that "[a]n officer may use

18   deadly force to apprehend a fleeing suspect only if the officer has probable cause to believe

19   that the suspect poses a threat of serious physical harm, either to the officer or to others

20   [and] [a] suspect may pose such a threat if there is probable cause to believe that he has

21   committed a crime involving the infliction or threatened infliction of serious physical harm,

22   or if the suspect threatens the officer or others with a weapon capable of inflicting such

23   harm."  *Id.* at 1174 (citation omitted).  The Court noted that in cases where the Supreme

24   Court found that deadly force was permissible in the context of a car chase, "the suspect's

25   conduct before the shooting demonstrated that he was likely to continue to threaten the

26   lives of those around him in his attempt to escape."  *Id.* at 1180 (citation omitted).  In *Orn*,

27   there was never any suggestion that the driver posed any threat to the public, and there

28   were disputed issues of fact as to whether the officer was ever threatened by the slow

driving.  *Id.*  The Court recognized that "[b]y the time of the shooting in October 2011, at least seven circuits had held that an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him," and there was a question of material fact whether the driver posed any threat to the officer before the shooting.  *Id.* at 1178.  The *Orn* Court noted, however, that "[o]fficers may use deadly force to halt the flight (or continued flight) of a motorist who they reasonably believe will pose a deadly threat to the lives of pedestrians or other motorists*." Id.* at 1180.

Here, unlike in *Orn*, Cockrum's leading the police on a chase of a semi truck involving high speeds, during the day, toward a populated Walmart parking lot after having threatened a warehouse employee and a police officer, nearly running a border patrol officer over, and continuing to drive onto a populated freeway while striking police vehicles posed an imminent threat to other drivers and members of the public.  The driver in *Orn* had not committed any serious crime and had not posed any danger to the public through his driving.  The facts of *Orn* and the reasoning of the Court are simply too different to have clearly established that the force used in this case was unacceptable.

In *Adams v. Speers*, a teenager was driving through the country in the afternoon and ran several stop signs.  473 F.3d 989, 991 (9th Cir. 2007).  An officer signaled for the teenager to pull over, but the teenager ignored the signal and continued to drive at a leisurely pace, while waving at acquaintances.  (*Id.*)  Other officers joined the pursuit and one of these officers, without conveying his intentions to other officers, rammed the teenager's vehicle.  (*Id.*)  When that did not work, the rogue officer successfully rammed the vehicle, but both the rogue officer and teenager were able to keep driving  *Id.*  As the teenager attempted to execute a U-turn, the rogue officer "cut through the divider and rammed the left rear of [the teenager's] vehicle with sufficient force to knock it off the shoulder of the road and down into a sandy embankment or ditch where it came to rest."  *Id.*  Patrol cars then surrounded the teenager's vehicle, preventing escape, and the teenager began to slowly inch the vehicle into a turn.  *Id.*  Another officer approached the vehicle,

1   broke the window with a baton and was planning to pepper spray the driver, when the rogue

2   officer drew his service weapon without warning and fired six rounds, killing the teenager.

3   *Id.* The Circuit held that the right was clearly established because "the absence of warning

4   and the lack of danger to the shooter or others distinguish the case from *Cole, Smith,* and

5   *Brosseau.*" *Id.* at 994. Unlike in this case, the teenager in *Adams* posed no threat to anyone,

6   had no opportunity to escape, no alternatives were used although one officer was already

7   carrying out an alternative that did not require lethal force, no warning was given prior to

8   the shooting, and the other officers at the scene did not perceive the threat.

9          *Acosta v. San Francisco* bears little resemblance to the facts of this case. In *Acosta*,

10   a police officer shot into a car, killing the driver, after the officer witnessed what he

11   believed to be a mugging. 83 F.3d 1143, 1144 (9th Cir. 1996). There was no suggestion

12   that the driver or the car were a threat to the general public, and the Court solely decided

13   whether the officer could claim that he was threatened when he positioned himself in front

14   of the slow moving vehicle and began shooting on the mere suspicion that some of the

15   occupants had been involved in a mugging. *Id.*

16          Here, there is no dispute that the Defendant officers used deadly force, which is "the

17   greatest degree of force possible," and the "most severe intrusion on . . . Fourth Amendment

18   rights." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 997–98 (9th Cir. 2020). "When

19   evaluating the government's interest, the most important factor is whether the person posed

20   an immediate threat to the safety of the officer or another." *Id.* at 998. Although Plaintiff

21   argues that Cockrum did not pose an immediate threat to anyone in particular, Cockrum's

22   actions throughout the day, and his driving a large eighteen wheel semi trailer truck with a

23   dangerously disabled trailer into traffic in the middle of the day toward another populated

24   area continued to pose a threat to the public.

25          Accordingly, the Court cannot find that it was clearly established such that every

26   reasonable officer would have understood that lethal force could not be used to stop

27   Cockrum from continuing to drive his eighteen-wheel semi trailer truck under the

28   circumstances of this case. Moreover, the officers tried various alternatives to firing their

weapons, including erecting roadblocks, which Cockrum drove through, and the officers attempted to disable Cockrum's vehicle, but he nonetheless continued to engage in extremely dangerous behavior in his large vehicle and was intent on resuming his flight. The officers likewise gave orders to stop and warnings before firing.  *See Marquez v. City of Phx.*, 693 F.3d 1167, 1175 (9th Cir. 2012) ("if the officer warned the offender that he would employ force, but the suspect refused to comply, the government has an increased interest in the use of force.").  Although Plaintiff argues that the number of shots exceeded the force necessary, the facts of this case do not support this contention and are readily distinguishable from cases where the officer continued to shoot after it was indisputably clear that the threat had ended.  Here, there is no evidence that any officer continued to shoot after it was indisputably clear that the threat had ended and it is not clearly established that the number of shots fired violated the Fourth Amendment.  *See Wilkinson v. Torres*, 610 F.3d 546, 552–53 (9th Cir. 2010) ("To the extent that *Cowan* requires an officer to reevaluate whether a deadly threat has been eliminated after each shot, we disagree that it should be applied in the circumstances of this case.  Such a requirement places additional risk on the officer not required by the Constitution.").

For all of the foregoing reasons, Plaintiff has not met her burden of showing that the officers' actions, under the circumstances of this case, were in clear violation of the Fourth Amendment, and the Court will grant qualified immunity in favor of the Defendant officers as to the Fourth Amendment excessive force claim.

**B.    Fourth Amendment Failure to Intervene against Defendants Acevedo, Gallego, Batriz, Gomez, Villa, Lopez, Pimienta, and Bermudez in Count Three**

The Nogales Defendants assert that they are entitled to summary judgment as to Plaintiff's failure to intervene claims because there was no underlying constitutional violation, and a failure-to-intervene claim cannot be supported when the alleged violative act took place during a rapidly unfolding situation.

In Response, Plaintiff asserts that the four officers who opened fire along Grand Avenue violated a clearly established Fourth Amendment right, and to the extent

Defendants are claiming they did not have a realistic opportunity to stop their fellow officers, Plaintiff's Count Three is premised on the final volley of gunshots fired on Grand Avenue, and "each officer had a meaningful opportunity" to intervene during the approximately 90 seconds between the initial gunshots in the Walmart parking lot and the later volley.  Plaintiff asserts that none of the officers claim that they lacked opportunity to intervene in the gunshots, Defendants Lopez, Pimienta, and others were subjectively aware that their colleagues were opening fire in the Walmart parking lot because Lopez testified that he "heard other officers firing their weapons" within the Walmart parking lot, and Pimienta testified that "[a]s the truck started to move, I heard a gunshot."

In Reply, Defendants assert that simply because some of the Defendants heard gunshots in the Walmart parking lot shortly before the shots were fired on Grand Avenue does not establish that these officers had a "meaningful opportunity" to intercede, and the rapidly evolving, chaotic situation makes any claim of failure to intervene inappropriate.

As an initial matter, Plaintiff's failure-to-intervene claim fails because the Court has already found that the Defendant officers are entitled to qualified immunity as to the excessive force claim and such immunity would thus necessarily apply to a failure-to-intervene claim.   Additionally, Plaintiff has made no showing that the individual Defendants to this Count had a meaningful opportunity to intervene and does not discuss any evidence showing a meaningful opportunity to intervene.

For the foregoing reasons, summary judgment will be granted as to the failure-to-intervene claims in Count Three.

## C.   Fourteenth Amendment Denial of Familial Association against Defendant Bermudez in Count Four

Defendant Bermudez asserts that he is entitled to summary judgment on Count Four because to prevail on a Fourteenth Amendment right of familial association, Plaintiff must prove that the officers' conduct shocks the conscience, but here there is no evidence that Defendants were deliberately indifferent or that their actions were unrelated to legitimate law enforcement objectives.

In Response, Plaintiff argues that actual deliberation was practical for Defendant

Bermudez because he had "no idea" why his law enforcement colleagues were pursuing Cockrum, he knew only that Cockrum had carefully avoided striking two of his colleagues' patrol vehicles, that Cockrum was traveling at approximately 35 to 40 miles per hour along Grand Avenue (sometimes running red lights), and that Cockrum had shown Mr. Bermudez disrespect by "flipping the bird" at him.  Plaintiff asserts that Defendant Bermudez's conclusion that "that truck needed to be stopped at all costs" shows that he had time for deliberation, and he fired 13 rounds from the side and acted without any objectively reasonable basis to protect civilians.

In Reply, Defendants assert that assuming "actual deliberation" includes thinking on the side of the road about how to stop Cockrum and his 18-wheeler from killing someone, this assumption changes nothing because the facts do not show that the officers acted either with deliberate indifference or a purpose to harm unrelated to legitimate law enforcement objectives.

### 1.      Legal Standard

"The substantive due process right to family or to familial association is well established," and the state's interference with this liberty interest without due process of law is remediable under § 1983.  *Rosenbaum v. Washoe Cnty*., 663 F.3d 1071, 1079 (9th Cir. 2011) (citation omitted).  "To amount to a violation of substantive due process, however, the harmful conduct must shock [ ] the conscience' or 'offend the community's sense of fair play and decency.'" *Rochin v. California,* 342 U.S. 165, 172–73 (1952).  The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference" or (2) with a "purpose to harm*"* for reasons unrelated to legitimate law enforcement objectives.  *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Under the first situation, if a defendant is in a position "[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "shock the conscience." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707–08 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  "On the

1   other hand, when an officer makes a snap judgment because of an escalating situation,"

2   then the courts apply the "purpose-to-harm" standard.  *Id.* (quoting *Wilkinson*, 610 F.3d at

3   554).

4          Under Supreme Court precedent, conduct that "shocks the conscience" includes

5   conduct that violates the "decencies of civilized conduct," that is "brutal" or "offensive" or

6   "arbitrary."  *Cnty. of Sacramento*, 523 U.S. at 846–47 (citations omitted).  Negligence,

7   however, "is categorically beneath the threshold of constitutional due process."  *Id.* at 849.

8   Whether conduct such as recklessness or gross negligence shocks the conscience "is a

9   matter for closer calls."  *Id.* at 849 (noting that rules of due process are not "subject to

10   mechanical application" and depend on the particular facts in a case).

11                          **2.     Analysis**

12          Here, the purpose-to-harm standard applies because the evidence supports that the

13   officers had to make snap judgments in an escalating situation.  *I.A. v. City of Emeryville*,

14   No. 15-cv-04973-DMR, 2017 WL 952894, at *10 (N.D. Cal. Mar. 13, 2017) ("A court may

15   determine at summary judgment whether the officer had time to deliberate . . . or instead

16   had to make a snap judgment because he found himself in a quickly escalating situation . .

17   . 'so long as the undisputed facts point to one standard or the other.'") (citations omitted).

18   The Ninth Circuit has twice found that in the context of a car chase, where officers were

19   forced to make "repeated split second decisions" about moving vehicles that had the

20   potential to harm not only the defendant officers, but also the surrounding public, actual

21   deliberation was not practicable.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th

22   Cir. 2014) (even where there was a question of fact as to whether the force was excessive,

23   because the minivan was moving at the time the defendant officer, who was in the minivan,

24   shot the decedent in the head; the decedent did not obey the defendant officer's commands

25   to stop the minivan, actual deliberation was not practicable); *Wilkinson*, 610 F.3d at 554-

26   55 (the minivan was accelerating in close proximity to other officers).

27          Moreover, the evidence shows that Defendant Bermudez acted with the purpose of

28   legitimate law enforcement objectives.  "Legitimate objectives can include arrest, self-

protection, and protection of the public," and "[i]llegitimate objectives include 'whether the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).

Here, there is no indication in the record that Bermudez had any improper or ulterior motives when he shot Cockrum, and there is no evidence in the record that Cockrum was "clearly harmless" or "subdued" when Bermudez shot him.

Because there are no disputed issues of material fact, summary judgment will be granted in favor of Defendant Bermudez as to Count Four.

### D.    Battery and Wrongful Death (Count Five)

Plaintiff's wrongful death claim is based on the intentional tort of battery as asserted against Bermudez, Bunting, Acevedo, Villa, Gallego, Lopez, Batriz, Pimienta, and Gomez. Plaintiff additionally purports to bring a wrongful death claim based on "negligence" against the City of Nogales and Hathaway based on:

> 1) respondeat superior liability as the employers of the individual defendants who committed intentional torts; and
> 2) negligence liability on the basis that the City of Nogales and Hathaway negligently failed to:
>> a. Establish proper communication to ensure that the employees of Santa Cruz County Sheriff's Office and employees of the Nogales Police Department all had access to the relevant information during the approximately two hours leading up to the shooting death;
>> b. Train and supervise their employees on the proper circumstances in which to engage in lengthy law enforcement chases, where the suspect neither poses an immediate threat nor is wanted for a serious crime;
>> c. Train and supervise their employees on the proper use of deadly force, particularly in the context of shooting into moving vehicles.

(Doc. 63 at 29-30.)

. . . .

. . . .

1              **1.      Nogales and Hathaway**

2              Defendants assert that they are entitled to summary judgment on Plaintiff's wrongful

3      death negligence claim because there is no evidence that they knew of a propensity for the

4      use of excessive force by the officers.  "A public entity is not liable for losses that arise out

5      of and are directly attributable to an act or omission determined by a court to be a criminal

6      felony by a public employee unless the public entity knew of the public employee's

7      propensity for that action."  Ariz. Rev. Stat. Ann. § 12-820.05(B).  In Response, Plaintiff

8      argues that Defendants cannot simultaneously argue that the officers acted reasonably and

9      argue that their conduct was a felony.  Plaintiff additionally argues that it would be

10     improper for the Court to determine whether the conduct at issue was a felony based solely

11     on Plaintiff's allegations.  To support the latter proposition, Plaintiff cites a case decided

12     on a motion to dismiss, which declined to decide the issue until the factual record was

13     developed.

14             Here, the factual record is developed, and Plaintiff's claims are based on the

15     allegation that the officers shot Cockrum without cause and the shots struck Cockrum.

16     Accordingly, under Plaintiff's theory, the Defendant officers would at least be guilty of

17     felony aggravated assault.[9]  Plaintiff does not point to any evidence that the City or

18     Hathaway knew of a propensity for the use of excessive force by any of the individual

19     Defendants.  As such, Plaintiff's claims against the City of Nogales and Hathaway are

20     precluded pursuant to Arizona Revised Statutes § 12-820.05(B).

21             **2.      Bermudez, Bunting, Acevedo, Villa, Gallego, Lopez, Batriz,**
22                     **Pimienta, and Gomez**

23             To succeed on a battery claim, Arizona law requires a plaintiff to prove "that the

24     defendant intentionally engaged in an act that results in harmful or offensive contact with

25     _____

26             [9] Arizona Revised Statutes § 13-1204(A) relevantly provides that a person commits
27     aggravated assault if they cause "serious physical injury to another" or "[i]f the person
       commits the assault by any means of force that causes temporary but substantial
28     disfigurement, temporary but substantial loss or impairment of any body organ or part or a
       fracture of any body part."  Ariz. Rev. Stat. § 13-1204(A)(1) and (3).

1    the person of another." *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1044 (D. Ariz.

2    2017) (citations omitted).

3            Defendants argue that they are entitled to summary judgment on Plaintiff's battery

4    claims because Arizona's justification defenses protect their conduct.  Under Arizona law,

5    "[n]o person . . . shall be subject to civil liability for engaging in conduct otherwise justified

6    pursuant to the provisions of this chapter." Ariz. Rev. Stat. § 13-413.  Law enforcement

7    officers are justified in using deadly force "when the peace officer reasonably believes that

8    it is necessary . . . [t]o effect an arrest or prevent the escape from custody of a person whom

9    the peace officer reasonably believes . . . [h]as committed . . . a felony involving the use of

10   a deadly weapon." *Id*. § 13-410(c).  Defendants may also rely on presumptions in Arizona

11   Revised Statutes § 12-716, which sets forth presumptions concerning crime victims and

12   law enforcement officers.  *Ryan v. Napier*, 425 P.3d 230, 241 (Ariz. 2018).   If a

13   presumption applies, the burden shifts to the plaintiff to produce evidence to rebut the

14   presumption, although the defendant retains the burden of persuasion.  *Id.*  The relevant

15   presumption applies if an officer proves by a preponderance of the evidence that the

16   decedent was "fleeing after having committed . . . a felony criminal act" and that the officer

17   used deadly physical force to "[e]ffect an arrest or prevent or assist in preventing a

18   plaintiff's escape."  Ariz. Rev. Stat. § 12-716.

19           Defendants assert that there was probable cause to believe Cockrum had committed:

20   1) Aggravated Assault in violation of A.R.S. § 13-1204(A)(8)(a) on a Sheriff's Deputy by

21   displaying two knives and brass knuckles when the deputy attempted to contact him, and

22   against a Border Patrol agent by driving towards her while avoiding stop sticks when

23   engaging in his U-turn in the median at the Border Patrol Checkpoint; (2) Endangerment

24   in violation of A.R.S. 13-1201(A) against the Border Patrol agent in (1) above, and against

25   Santa Cruz Sheriff's Department Deputy Ainza when he endangered Deputy Ainza with a

26   substantial risk of imminent death or physical injury when Cockrum drove towards Deputy

27   Ainza who was ordering him to stop after witnessing Cockrum almost strike the Border

28   Patrol agent, and Cockrum continued driving towards Deputy Ainza forcing him to move

out of the way or be struck by Cockrum's vehicle; and (3) Unlawful Flight in violation of A.R.S. § 28-622.01, including attempting to elude marked law enforcement vehicles with emergency lights and sirens activated and speeding 65-70 miles per hour in a marked construction zone with a posted speed limit of 45 miles per hour.

In Response, Plaintiff asserts that "Arizona's justification statutes mirror the Fourth Amendment standard for the use of deadly force," and if any of the four officers who fired on Grand Avenue acted unreasonably for Fourth Amendment purposes, "the justification statutes therefore provide no defense" on the state-law battery claim.  Plaintiff further argues that the NPD Defendants failed to explain why force of more than 100 bullets "was necessary."

Here, Defendants have shown by a preponderance of evidence that Arizona's justification statutes support the shooting as Cockrum had committed felony acts and the officers shot to prevent or assist in preventing Cockrum's escape.  Plaintiff does not rebut this presumption.  Accordingly, Defendants are entitled to summary judgment on the battery claims in Count Five.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to: (1) Defendants Hathaway and Bunting's Rule 36 Motion to Determine Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2 and 3 (Doc. 64); (2) Defendants Hathaway and Bunting's Motion for Summary Disposition of their Rule 36 Motion to Determine Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2 and 3 (Doc. 71); (3) Defendants Hathaway and Bunting's Motion for Summary Judgment (Doc. 75); (4) City of Nogales, Roy Bermudez, Nicholas Acevedo, Gerardo Batriz, Guadalupe Villa, Robert Gallego, Jesus Gomez, Mario Lopez, and Jose Pimienta's Motion for Summary Judgment (Doc. 77); and (5) Plaintiff's Motion for Partial Summary Judgment (Doc. 87).

(2)    Defendants Hathaway and Bunting's Motion for Summary Judgment (Doc. 75) is **granted**.

1    (3)    The City of Nogales, Roy Bermudez, Nicholas Acevedo, Gerardo Batriz,

2    Guadalupe Villa, Robert Gallego, Jesus Gomez, Mario Lopez, and Jose Pimienta's Motion

3    for Summary Judgment (Doc. 77) is **granted**.

4          (4)    Plaintiff's Motion for Partial Summary Judgment (Doc. 87) is **denied**.

5          (5)    Defendants Hathaway and Bunting's Rule 36 Motion to Determine

6    Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2 and 3 (Doc. 64) and

7    Defendants Hathaway and Bunting's Motion for Summary Disposition of their Rule 36

8    Motion to Determine Sufficiency of Plaintiff's Answer to Requests for Admission Nos. 2

9    and 3 (Doc. 71) are **denied as moot**.

10         (6)    This action is terminated with prejudice.  The Clerk of Court must enter

11   judgment accordingly.

12         Dated this 20th day of February, 2024.

13

14

15

16                                    _____

17                                        Honorable Raner C. Collins
                                        Senior United States District Judge

18

19

20

21

22

23

24

25

26

27

28